**FOUR SEASONS HOTELS AND RE-SORTS B.V., Four Seasons Hotels (Barbados) Ltd., Four Seasons Hotels Limited, and Four Seasons Caracas, C.A., Plaintiffs,**

v.

**CONSORCIO BARR, S.A., Defendant.**

**No. 01–4572CIV.**

United States District Court,
S.D. Florida.

May 9, 2003.

John C. Carey, Esq., Stroock Stroock & Lavin, Juan J. Rodriguez, Esq., Alberto Jose Xiques, Esq., Rodriguez & Machado, P.A., Miami, FL, for Plaintiff.

Eduardo Palmer, Esq., Edwin G. Torres, Esq., Alan Seagrave, Esq., Steel Hector & Davis, Miami, FL, for Defendant.

## FINDINGS OF FACT

K. MICHAEL MOORE, District Judge.

Plaintiffs Four Seasons Hotels and Resorts, B.V., Four Seasons Hotels (Barbados), Ltd., Four Seasons Hotels Limited, and Four Seasons Caracas, C.A. are referred to herein collectively as "Four Seasons" or "Plaintiffs," unless otherwise indicated. Defendant Consorcio Barr, S.A. is referred to herein as "Consorcio" or "Defendant."

### Background Facts

1. The Four Seasons Hotel Caracas opened in January, 2001. (Bolivar, 12/16/02 Tr., 42:10–21).

2. Consorcio is the owner of the physical installations of the hotel, and Four

Seasons operates the hotel pursuant to a series of contracts. (Joint Pretrial Stipulation at ¶ 6(g)).

3. The parties entered into a License Agreement which allows Consorcio to use the Four Seasons brand name, trademarks and logos in connection with the operation of the Hotel, and in connection with the marketing for sale of Condominium units in a project which is adjacent to the Hotel. In exchange for the right to use the brand name, trademark and logos, Consorcio, *inter alia*, agreed to pay royalty fees to Four Seasons in accordance with a schedule contained in the License Agreement. (Plaintiffs' Exhibit 1).

4. The parties also entered into agreements for the management and operation of the Hotel. These agreements include the Hotel Management Agreement (Plaintiffs' Exhibit 2), the Hotel Advisory Agreement (Plaintiffs' Exhibit 3), the Hotel Pre–Opening Services Agreement and the Hotel Services Agreement.

### Consorcio

5. The principal shareholders of Consorcio are Carlos, Lautaro and Marbella Barrera. (Barrera, 1/17/03 Tr., 6: 1–3).

6. Carlos Barrera is the majority shareholder of Consorcio. (Barrera, 1/21/03 Tr., 34: 7–9).

7. Marbella Barrera, a resident of New Jersey, who has lived in the United States for the past 14 years, is a principal shareholder of Consorcio. Marbella attended almost all of the pre-contract negotiations between Consorcio and Four Seasons. (Barrera, 1/21/03 Tr., 124: 2–4; 135: 10–12; Ferraro, 1/9/03 Tr., 14: 6–10).

8. Consorcio contracted with a Miami, Florida architectural firm to design the building that became the Four Seasons Caracas hotel. (Barrera, 1/17/03 Tr., 7: 17–20).

9. Consorcio also contracted with a Miami, Florida engineering firm for the hotel's air conditioning. (Barrera, 1/17/03 Tr., 8: 4–5).

10. Consorcio visited at least one other Four Seasons hotel prior to entering into the contracts with Four Seasons. (Barrera, 1/17/03 Tr., 10: 5–7).

11. Consorcio also attended meetings at one of Four Seasons' hotels in California with Four Seasons' executives during the pre-opening phase of the project. (Barrera, 1/17/03 Tr., 26: 16 –20; 1/21/03 Tr., 49: 11–12).

12. Consorcio contractually agreed to litigation in Florida regarding claims relating to the License Agreement. (Plaintiffs' Exhibit 1, License Agreement § 11.06).

### Four Seasons

13. Four Seasons has been in the luxury hotel business continuously since 1961, and has continuously used its trademark "Four Seasons" since that time. (Ferraro, 1/8/03 Tr., 48: 4–19).

14. Four Seasons worldwide has a centralized reservation system located at the corporate office in Toronto, Canada. (Bolivar, 12/16/02 Tr., 74: 19–25).

15. Four Seasons is a global business, and operates 23 of its luxury hotels within the United States. (Ferraro, 1/8/03 Tr., 48: 25; 49: 1–3). Four Seasons has been operating hotels in the United States since 1976. (Ferraro, 1/8/03 Tr., 49: 15–20).

16. Four Seasons has been recognized by industry publications as the leading hotel operator in the world. Of 51 hotels in the Four Seasons chain, 36 were named by Travel & Leisure magazine as among the Top 500 hotels in the world. Four Seasons has also received the most Mobil 5–stars and AAA 5–diamond awards of any luxury hotel company. J.D. Power has voted Four Seasons as the best luxury

hotel operator in the world. Fortune magazine has ranked Four Seasons as one of the top 50 companies to work for in North America. Many of the hotels within the chain garnering such international acclaim are located within the United States, including Chicago, Boston, Los Angeles, Washington DC, San Francisco and Houston. (Ferraro, 1/8/03 Tr., 49: 21–25; 50: 1–25). All use the trademark "Four Seasons." (Ferraro, 1/8/03 Tr., 52: 3–4).

17. The physical product of the hotel is critical to the brand image and reputation of Four Seasons, which is why Four Seasons requires that its quality control standards and guidelines be followed. (Ferraro, 1/8/03 Tr., 53: 11–25; 54: 1–5; 55:6–9).

18. There is a direct and critical relationship between the quality of a new hotel and the success of the chain as a whole: "Our guest impact on new properties creates not only new business for the hotel they are in, but new business for the global chain of our hotels.... So it is extremely important that every hotel we open personifies and mirrors the other sisters and brothers in their company, which is the other Four Seasons hotels." (Ferraro, 1/08/03, 55: 15–25; 56:1).

19. Four Seasons spends approximately $100 million annually in advertising and marketing its trademarks and brand name. (Ferraro, 1/8/03 Tr., 58: 25; 59: 1–7).

20. Four Seasons is a publicly traded company listed on the New York Stock Exchange. (Ferraro, 1/8/03 Tr., 60: 9–10).

21. Four Seasons' revenues in 2002 were approximately $2 billion.

22. Approximately 50% of the guests at Four Seasons hotels worldwide come from the United States. (Ferraro, 1/8/03 Tr., 60: 18–21). Out of 2 million guest profiles contained in the Fidelio customer information system, approximately 1 million are for United States customers. (Henry, 1/10/03 Tr., 82: 3–10).

23. Four Seasons has implemented a series of quality control standards, developed over the 40–year history of the company, which relate to all areas of a hotel and how it should function as a luxury hotel, including marketing, food and beverage, rooms, security, systems, and employees, among other areas. (Ferraro, 1/7/03 Tr., 199: 12–25).

### The Relationship between the Parties

24. Consorcio wanted to enter into agreement with Four Seasons for the operation and management of the hotel in Caracas due to Four Seasons' reputation as the leading hotel operator in the world, its customer base and the existence of its global chain of luxury hotels. (Ferraro, 1/8/03 Tr., 4: 2–11).

25. Four Seasons advised Consorcio during pre-contract discussions that building a Four Seasons hotel requires "sticking to the game plan." The "game plan" includes Four Seasons' quality control manuals that depict how the hotel should be constructed, furnished, equipped and operated, "everything that makes a Four Seasons hotel what it is." (Ferraro, 1/8/03 Tr., 4: 18–24). These constitute "tried and proven ways of doing business." (Ferraro, 1/8/03 Tr., 15: 17–18). These written guidelines are extensive and complete construction documents that cover everything from a floor covering to a light switch to a bathroom fixture. Every Four Seasons hotel owner agrees by contract to build and furnish the hotel according to the guidelines. (Ferraro, 1/8/03 Tr., 35: 25; 36: 1–7).

26. Four Seasons provided these manuals to Consorcio in document form "prior to coming to the contractual agreements to ensure that they understood the scope of what they were undertaking." (Ferraro, 1/8/03 Tr., 4: 25; 5: 1–2; 36: 8–4).

27. Consorcio indicated to Four Seasons that they would not only comply with Four Seasons' standards relating to the structural parts of the hotel, including furniture, finishes and equipment, but would exceed them. (Ferraro, 1/8/03 Tr., 10: 6–3).

28. Consorcio also understood that Four Seasons would be bringing its reputation in major markets visiting Venezuela, particularly in the investment banking and oil and gas industries, which Four Seasons had developed at leading hotels in Texas and California where these customers were based. (Ferraro, 1/8/03 Tr., 4: 25; 5: 1–2). Consorcio understood that Four Seasons' reputation in this area would be a great start for a customer base for the hotel in Caracas, as business travelers from these industries were already visiting Caracas or would be in the future. (Ferraro, 1/8/03 Tr., 5: 6–13).

### The Opening

29. Four Seasons operates its hotels according to established global policies and procedures. (Giacometti, 1/7/03 Tr., 13: 15–20).

30. Yves Giacometti was named pre-opening manager of the Four Seasons Hotel Caracas in approximately December 1999. (Giacometti, 1/7/03 Tr., 8: 13–18). Giacometti, however, was not the first General Manager assigned to Caracas. Prior to his being named pre-opening general manager, three others had held the position: George Cordon, Hans Bratt and Olivier Masson. (Giacometti, 1/7/03 Tr., 8: 19–25. 9: 1–6). It is unusual for there to be four general managers prior to the opening of a Four Seasons hotel, as was the case in Caracas. (Giacometti, 1/7/03 Tr., 9: 7–9).

31. As the General Manager, it was Giacometti's responsibility to share with all employees, during the hiring process, the Four Seasons' policies and procedures so that they could learn to operate the hotel as a Four Seasons. (Giacometti, 1/7/03 Tr., 14: 2–9). Consorcio often did not co-operate in the implementation of standard Four Seasons' policies and procedures. (Giacometti, 1/7/03 Tr., 14: 16–18). For example, Consorcio was responsible for construction of the hotel, but the hotel was not constructed in a timely fashion. (Giacometti, 1/7/03 Tr., 16: 2–8). Indeed, at the time that the hotel opened, on or about January 18, 2001, construction was not even complete. (Giacometti, 1/7/03 Tr., 16: 9–13).

32. Due to Consorcio's delays in construction, the hotel in Caracas opened behind schedule. (Ferraro, 1/8/03 Tr., 19: 22–24). The opening dates had been pushed back eight or nine times. (Ferraro, 1/8/03 Tr., 34: 23–25, 35: 5). On one occasion, at a meeting between Four Seasons and Consorcio in Carlsbad, California, Consorcio indicated that it was shutting down construction due to its financial difficulties. (Ferraro, 1/8/03 Tr., 37: 10 –13).

33. Despite the delays, the hotel was not completed on opening day. The presidential suite was (and remains) incomplete, the governor's suite was (and remains) incomplete, none of the suites was finished at the time of the hotel's opening, the poolside restaurant was "a hole," and the spa was not completed. (Barrera, 1/21/03 Tr., 70: 8–25, 71: 1–25, 72: 1–22).

34. The sole reason that the hotel was opened was due to incredible pressure from Consorcio. Four Seasons resisted this pressure and did so up until 15 minutes before the hotel actually opened. (Giacometti, 1/7/03 Tr., 71: 7–15, 82: 22–25).

35. Normally, a hotel does not open until a certain critical path has been followed. That path includes a pre-opening process as well as certain marketing steps that ensure that business is waiting at the

door on the first day of operations. (Giacometti, 1/7/03 Tr., 28: 22–25, 29: 1–6). Four Seasons was not able to follow that policy and procedure in Caracas due to Consorcio's lack of cooperation. There were multiple problems and deficiencies: (i) when the hotel opened, there were only about 30 rooms ready for occupancy; (ii) there was only one restaurant and one bar; (iii) the spa was not finished; (iv) there was no sign in front of the hotel; (v) there were some employees that had no uniforms; (vi) many safety issues had not been dealt with by Consorcio despite Four Seasons' prior requests to do so; and (vii) many of the functional needs of the hotel operations had not been complied with by Consorcio, such as having bank accounts, having a power of attorney so that the General Manager could sign contracts in dealing with suppliers for the hotel, resulting in the General Manager having to find ways to convince companies to work with the hotel despite the fact that he could not provide them with a signed contract. (Giacometti 1/7/02 Tr., 29: 10–24).

36. The responsibility to put up the sign belonged to Consorcio. Nevertheless, Consorcio did not do so despite repeated requests from Four Seasons, which even provided various designs for the sign. (Giacometti, 1/7/03 Tr., 30: 3–10).

37. Consorcio was also obligated to provide bank accounts. It did not do so. (Giacometti, 1/7/03 Tr., 30: 11–17). The power of attorney to allow the General Manager to sign contracts was never signed by Consorcio and given to Four Seasons, despite the fact that it was central to the normal operation of the hotel on a daily basis.

38. These power of attorney documents are executed in all instances between the ownership and Four Seasons across the chain. Yet, despite the fact that Four Seasons repeatedly requested that they do so, Consorcio would not execute the power of attorney documents. (Giacometti, 1/7/03 Tr., 30:22–25, 31: 1–13).

39. The opening of the Four Seasons Hotel Caracas was in no way similar to a typical Four Seasons opening. It is atypical for Four Seasons at opening not to have bank accounts or powers of attorney. It is also unusual to have moving targets as far as the hotel opening date. Finally, Four Seasons does not typically open a hotel when areas are incomplete and when it is not in a position to pay local or international vendors and suppliers. (Giacometti, 1/7/03 Tr., 31: 22–25, 32: 1–8).

40. There was a myriad of other issues that came up including the fact that the engineering department did not have tools and in many instances the hotel was required to borrow or rent furniture, fixtures and equipment in order to operate. (Giacometti 1/7/03 Tr., 33: 11–24). It was Consorcio's obligation to provide all of these supplies and equipment. (Giacometti, 1/7/03 Tr., 33: 25, 34: 1).

41. When the hotel opened, not all of the kitchen equipment that was required was available, not all of the computer equipment and furniture was available, and with respect to the furniture that was available, and the furnishings that were provided by Consorcio, those were not in accordance with Four Seasons' standards for high-quality furnishings. (Giacometti, 1/7/03 Tr., 34: 1–9). These issues were raised with Consorcio, and Four Seasons requested that Consorcio correct these problems. Consorcio, however, did not do so. (Giacometti, 1/7/03 Tr., 34: 10–17).

42. Four Seasons has requirements and standards for the furniture, fixtures, and equipment, computer equipment, and various other furnishings and items required for a world class luxury hotel. These guidelines are uniform throughout the Four Seasons' organization. (Giacometti, 1/7/03 Tr., 17: 19–25, 18: 1–2). It was

Consorcio's responsibility to purchase the furniture and fixtures and equipment for the hotel, in accordance with requirements provided by Four Seasons. (Giacometti, 1/7/03 Tr., 17: 2–8). Four Seasons provided Consorcio with a written list of the requirements for the necessary furniture, fixtures and equipment for the hotel. (Giacometti, 1/7/03 Tr., 17: 9–12).

43. With respect to the computer systems, Consorcio was responsible for paying for the acquisition of the computer equipment. (Giacometti, 1/7/03 Tr., 18: 3–5). Four Seasons had very specific requirements concerning the type and capabilities of equipment to be implemented, including in some cases the specific manufacturers and specific models for the equipment necessary. (Giacometti, 1/7//03 Tr., 18: 3–25) These are standardized requirements for all Four Seasons hotels. (Giacometti, 1/7/03 Tr., 19:1–3).

44. Despite the fact that these requirements were communicated to Consorcio on several occasions, not only by Giacometti but also by senior systems managers and the Systems Director from the Four Seasons Corporate Office, Consorcio did not meet the requirements for computer equipment for the hotel in Caracas. (Giacometti, 1/7/03 Tr., 19: 4–14).

45. All of this was very cumbersome to Four Seasons' managers of the hotel because they were constantly having to deal with those issues instead of focusing on what was more important, the operation of the hotel in order to produce profit. (Giacometti, 1/7/03 Tr., 31: 22–25, 32: 1–8).

### *The Fidelio Database*

46. Fidelio is the central system for management used at all Four Seasons Hotels. (Bolivar, 12/16/02 Tr., 74: 13–14).

47. Fidelio is a commercially available software package. However, Four Seasons does not use the Fidelio package in the standard form that is available com-mercially. (Bolivar, 12/16/02 Tr., 76: 12–19; Camacho, 12/20/02 Tr. 12: 20–21).

48. Four Seasons does not consider the Fidelio software itself to be confidential, but rather considers the customized shell which Four Seasons utilizes in Fidelio and the information contained within the Fidelio databases to be confidential. (Camacho, 12/20/02 Tr., 12: 22–25).

49. Fidelio contains a significant amount of data that is proprietary to Four Seasons. (Lind, 1/6/03 Tr., 98: 17–18). For example, it contains: (i) guest information; (ii) information relating to charges; (iii) guest profiles; (iv) data on check-ins and check-outs; (v) guest data; (vi) who the key guests are; (vii) guests preferences; (viii) credit card information; (ix) passport information; (x) statistical information such as occupancy and average daily rates; (xi) and other information. It also includes information on corporate customers, top corporate clients, and top global partners. Additionally, it provides the status of any room at a given time, follows guests throughout the hotel and provides information regarding guests' consumption. (Bolivar, 12/16/02 Tr., 74: 13–18); (Lind, 1/6/03 Tr., 98: 10–18); (Camacho, 12/20/02 Tr., 12:13–19).

50. Fidelio also has interfaces to all the other Four Seasons' computer systems so that information generated from any of the other programs or systems comes back to Fidelio. For example, there is a link with Micros and there is a link to the PBX system (for telephone calls). These links allow for collection of all charges generated from the various systems and for application of those charges to the appropriate guest accounts. (Camacho, 12/20/02 Tr., 12: 3–12).

51. Four Seasons corporate office sends to Fidelio requests so that Fidelio personnel can configure certain modules of the Fidelio program. One of the modules

that is modified is the guest profile module. (Bolivar, 12/16/02 Tr., 76: 19–22). This guest profile is unique to Four Seasons. (Bolivar 12/16/02 Tr., 77: 1–4).

52. In creating customized shells for the Fidelio program, Four Seasons has projected onto the Fidelio shell procedures and formatting for the display and use of Four Seasons guest information, thus differentiating themselves from other hotels. (Camacho, 12/20/02 Tr., 13: 1–8). For example, all hotels have reservations procedures. However, Four Seasons has its own standards regarding how the reservation process should be managed, and has engrafted that onto the shell. (Camacho, 12/20/02 Tr., 13: 9–15).

53. Four Seasons does not make these shells available to anyone outside the company because it would amount to sharing the core standards of the company with outsiders. Four Seasons instead, takes steps to insure the confidentiality of those core standards. (Camacho, 12/20/02 Tr., 13: 16–22).

54. The Fidelio guest profile contains, in part, the following information regarding a Four Seasons guest: (i) last name; (ii) first name; (iii) the city that the guest or the company comes from; (iv) company affiliation; (v) home phone number; (vi) work number; (vii) nationality; (vii) marital status; (viii) type of travel documentation or identification, including the passport number; (ix) date of birth; (x) information about the guest's last stay; (xi) information about the guest's next stay; (xii) comments box for guest preference information.; and (xiii) a VIP designation number. (Camacho, 12/20/02 Tr., 18: 9–13, 22–25, 19: 1–25, 20:1–20; Bolivar, 12/16/02 Tr., 75: 15–19). Due to the clientele of Four Seasons worldwide, Fidelio also contains guest profiles that are highly sensitive, including those of presidents of the United States, heads of state, queens and kings, celebrities,

CEO's and captains of industry. (Ferraro, 1/9/03 Tr., 44:23—45:6).

55. The VIP designation consists of a number from one to four. (Camacho 12/20/02 Tr., 18: 14–21). Different VIP codes are assigned to each guest, and reports can be generated by the VIP codes. (Camacho, 12/20/02 Tr., 31: 9–17). A VIP code of 1 is the highest, and is usually attained only by someone who is a CEO of a prominent company, a head of state or otherwise someone with a very high standing to the company. (Camacho, 12/20/02 Tr., 31:22–25, 32:1–2).

56. The comment section includes information which may be a preference that the guest may have during his stay and/or that he is a repeat guest. (Camacho 12/20/02 Tr., 18: 22–25, 19: 1–25, 20: 1–20); (Bolivar 12/16/02 Tr., 77: 9–25).

57. The purpose of the guest profile is essentially to allow personalized treatment toward the guest and to know of his or her preferences so that Four Seasons can provide customer service of the highest quality. (Bolivar 12/16/02 Tr., 78: 7).

58. Four Seasons considers the information contained in the guest profiles to be confidential pursuant to its policies and procedures. Therefore, it takes steps to safeguard the secrecy of that information. (Bolivar 12/16/02 Tr., 78: 13–19).

59. By flipping to different Fidelio screens, one can access a particular guest's stay history with a hotel. (Camacho, 12/20/02 Tr., 20: 21–25, 21: 1). A guest profile is different than a guest history. A guest history is a simple outline of the guest stay in the hotel, such as when he arrived and left and how much he spent. A guest profile goes much deeper, and includes other hotels the guest has traveled to, and personal information concerning his or her preferences and other per-

sonal details. (Ferraro, 1/9/03 Tr., 124:7—125:1; Henry, 1/10/03 Tr., 79:23—80:5).

60. The guest history information provides information about the total individual stays and one can then access the specific data for each day. (Camacho, 12/20/02 Tr., 21: 2–4). The detail screen contains information about the arrival date, the date that the guest leaves, the rate he paid, data pertaining to the guest's credit card and other information pertaining to marketing, such as marketing goal source and other useful data to the corporate marketing department. The screen also contains information about the income that the particular guest generated to the hotel, broken down between different areas such as room revenue or food and beverage revenue. (Camacho, 12/20/02 Tr., 21: 2–10).

61. The market code reflects information about which market generated the guest's reservation. For example, WWC is a market code which represents that the guest's stay was generated from World–Wide Corporate Four Seasons.

62. Fidelio also tracks the status of each guest. For example, the system tracks whether the guest is in-house, when the guest will leave and the history and profiles for each guest. If a guest stays in one Four Seasons Hotel and then makes a reservation at another hotel, the second hotel has access to the guest profile from the first visit. (Bolivar, 12/16/02 Tr., 78: 8–12).

63. Fidelio also contains data within the database which Four Seasons treats as confidential because it has information pertaining to Four Seasons' global corporate accounts, preferred travel agency partners, as well as other information that is only for Four Seasons' use. (Camacho, 12/20/02 Tr., 13: 23–25, 14: 1–2).

64. Four Seasons' corporate accounts are those global commercial accounts which generate stays at Four Seasons Hotels worldwide, and which Four Seasons recognizes as having generated substantial profits worldwide. (Camacho 12/20/02 Tr., 14: 3–7). Examples of these corporate accounts include Exxon Mobil and Coca–Cola. (Camacho, 12/20/02 Tr., 14: 8–11). Four Seasons' relationships with its global corporate ·customers have been built up over time as Four Seasons has delivered a high level of service, and consistency of service, that these customers have come to expect from Four Seasons. (Lind, 1/6/03 Tr., 98: 19–25, 99: 1–3). Four Seasons maintains worldwide sales offices in Los Angeles, Chicago, Atlanta, London, Paris and the Far East to strengthen its relationships with its global corporate customers. (Lind, 1/6/03 Tr., 99: 10–21).

65. Four Seasons' preferred partners are those travel agencies that Four Seasons affords a preferred treatment to based upon the profits that they generate to Four Seasons Hotels worldwide. (Camacho, 12/20/02 Tr., 14:14–17).

66. Corporate accounts and preferred partners are global and not specific to any one local hotel. (Camacho, 12/20/02 Tr., 14: 18–22). Four Seasons does not share information about its corporate partner accounts or preferred partners with anyone outside of Four Seasons. (Camacho 12/20/02 Tr., 14: 23–25, 15:1).

67. The information contained in Fidelio contains valuable information that gives Four Seasons a competitive advantage in the marketplace by enabling Four Seasons to anticipate a guest's needs upon arrival and "all the type of information that a luxury hotel would want about taking care of its customers." (Ferraro, 1/9/03 Tr., 45: 14–25, 46: 1–9).

68. Four Seasons takes extensive measures to ensure the secrecy of the data contained in Fidelio. (Ferraro, 1/9/03 Tr., 44: 19–21; Henry, 1/10/03 Tr., 80: 6–7).

## Scala

69. The Scala system stores a financial information database which provides invaluable tools for internal financial management purposes. (Lind, 1/6/03 Tr., 102: 9–22).

70. Four Seasons has never shared its Fidelio or Scala databases or the information contained in the databases with an owner, nor did Four Seasons ever consent to Consorcio having access to these databases. (Lind, 1/6/03 Tr., 101: 23–25, 102: 1–5, 103: 2–8; Ferraro, 1/9/03 Tr., 45: 7–13).

### The Data Stolen on February 22, 2002

71. On February 22, 2002, Bolivar received two letters from Consorcio Barr requiring access to Bolivar's office and information that was maintained on several Four Seasons' computer servers in her office. (Bolivar 12/17/02 Tr., 62: 9–18).

72. Four Seasons' policy forbids employees from providing information to the owners; rather, employees are required by policy to refer the owner to the General Manager. (Bolivar 12.17.02 Tr., 23: 1–11). Therefore, Bolivar contacted the General Manager of the hotel, who instructed her not to provide any information. (Bolivar 12/17/02 Tr., 62: 16–22).

73. Bolivar informed Consorcio that Four Seasons was not going to provide Consorcio with the information that they were requesting. Lautauro Barrera reacted by getting very upset and saying that if Bolivar was not going to provide the information, he would not provide Bolivar access to her own office. Barrera then posted two people in the entrance to Bolivar's office so that she would not be able to get in. (Bolivar 12/17/02 Tr., 63: 2–17).

74. Immediately following that incident, Bolivar went to the Human Resources office of the hotel to wait for the situation to calm down. However, when it did not, she returned to her office with Bob O'Neil, the director of security for the hotel, in order to retrieve her purse. (Bolivar 12/17/02 Tr., 64: 6–15).

75. When Bolivar and O'Neil attempted to retrieve Bolivar's handbag, Eduardo Bencomo blocked the entrance to the doorway and then radioed for Consorcio's security personnel. O'Neil requested additional hotel security personnel and a fight ensued. (Bolivar 12/17/02 Tr., 64:16–25, 65: 1).

76. After Bolivar retrieved her purse, she tried to leave the building, and was pursued by Consorcio's security personnel who were radioing back and forth giving her location. During this process, Bolivar was concerned for her safety, as she was being followed by Consorcio's security personnel. (Bolivar 12/17/02 Tr., 65: 5–9). When Bolivar tried to leave in her car, Consorcio's security personnel blocked her car and said that she could not leave the hotel until she opened the door and gave Lautaro Barrera what he was asking for. (Bolivar 12/17/02 Tr., 65: 11–15).

77. Bolivar then exited her car and left the hotel walking. Consorcio's personnel followed her and continued yelling at her. (Bolivar 12/17/02 Tr., 65:15–20).

78. Bolivar did not return to the hotel that night, but later, security called her and informed her that the door had finally been opened and Consorcio had copied information from the servers to some tapes. (Bolivar 12/17/02 Tr., 65: 21–25).

79. Thus, on February 22, 2002, a group of Consorcio's personnel, including armed security guards, forcibly entered the Four Seasons' computer systems room at the Caracas hotel. Under the pretext of self-executing a Venezuelan court order, Consorcio's personnel downloaded onto back-up tapes all of the guest information and data stored electronically on the Fidelio server in Caracas, as well as all of the

financial information and data stored electronically on the Scala server. The general manager of the hotel advised Consorcio that these actions were in violation of a United States court injunction, but Consorcio responded that the U.S. order meant nothing to them. (Lind, 1/6/03 Tr., 92:22—96:1).

80. On the morning of February 23, 2002, Bolivar returned to the hotel and ran reports to determine what information had been downloaded the day before. Bolivar generated two separate reports from the arch serve utility, one showing a summary of the information that had been downloaded the day before, and a second report detailing file by file all the files that Consorcio transferred from the Four Seasons' network to a tape backup. (Bolivar, 12/17/02 Tr., 66:11–25, 67:1–18, 68:2–17; Plaintiffs' Exhibits 10 and 18).

81. Bencomo admitted that the backup taken by Consorcio on February 22, 2002 included the programs and data contained in three key databases of the hotel: Fidelio, Micros and Scala. (Bencomo, 01/16/03 Tr., 137: 5–23).

82. The plain language of the License Agreement provides that Consorcio may only be entitled to hard copy print-outs of ·guest histories upon request. The License Agreement vests Consorcio with *no* rights to Four Seasons' raw data in electronic form, nor does it provide Consorcio with any rights to the entire guest profiles maintained in Fidelio. (License Agreement § 5.05, Plaintiffs' Exhibit 1).

83. Additionally, nowhere in the License Agreement is Consorcio provided rights to the information contained in the Micros or Scala systems. (Plaintiffs' Exhibit 1).

84. In fact, Consorcio acknowledges that the guest history reports it received were limited solely to guests' names, dates of arrival and dates of departure, and that they were provided in hard copy as specified in the License Agreement. (Barrera, 1/21/03 Tr., 13: 23–24, 14: 9–10, 127: 6–11). Consorcio asserts that for a brief period of time it was able to access this information on a Four Seasons' intranet page, but the extent of this information, too, was limited to guest names, dates of arrival and dates of departure. Consorcio acknowledges that Four Seasons refused to provide it access to the Fidelio system online. (Barrera, 1/21/03 Tr., 15: 3–5).

85. The information taken by Consorcio on February 22, 2002 included information regarding Four Seasons' global corporate customers, such as major U.S.-based clients like Chevron, Exxon Mobil, Goldman Sachs and BellSouth, each of which represents a substantial corporate customer based on numbers of nights spent per year at Four Seasons' properties worldwide. (Lind, 1/6/03 Tr., 99: 22–25; 100: 1–25; 101: 1–7, 148: 11–13).

86. The data taken by Consorcio on February 22, 2002 included proprietary information which, pursuant to the License Agreement, Consorcio was not entitled to have. (Plaintiffs' Exhibit 1). The definition of Proprietary Materials in the License Agreement makes an important distinction relating to a hard copy of a guest history, because if a guest history has to be provided under some unusual circumstance, "we would print out a hard copy and exclude the profile of the guest from that copy, which the profile and the history of the guest we would not give to an owner." (Ferraro, 1/9/03 Tr., 50: 13–25, 51: 23; Plaintiffs' Exhibit 1).

87. The Fidelio program is a relational database, which is a series of databases linked together by certain cues and keys. (Bolivar 12/17/02 Tr., 69:19–25, 70: 1–11). The information contained in the Fidelio database which was copied by Consorcio Barr on February 22, 2002 included information from the main system for manag-

ing the hotel. Therefore, Consorcio had a history of everything the hotel had done and a history of everything that each guest had done at the hotel. Consorcio also obtained information regarding reservations, guests, guests' preferences and anything guests may have charged at any of the charging centers. Additionally, Consorcio obtained marketing information and information regarding guests' personal information including telephone numbers, addresses and so on. (Bolivar 12/17/02 Tr., 70: 16–25, 71: 1).

88. Lautaro Barrera did not have a user ID for Fidelio in Caracas and Bolivar never installed the Fidelio software on Barrera's computer. Therefore, Lautaro Barrera did not have authorized access to Fidelio. (Bolivar, 12/17/02 Tr., 71:15–25, 72: 1).

89. By taking the data that was backed up on February 22, 2002 by Consorcio, and placing it on a laptop computer, it would be possible to access the entire Fidelio database and all the data contained in that copy or a backup of the data. (Bolivar, 12/17/02 Tr., 74: 4–7; Camacho, 1/20/02 Tr., 15: 2–10).

90. Using a compact disc copy of the information that Consorcio copied on February 22, 2002, Bolivar and Camacho were able to restore the Fidelio database and program onto a laptop computer. (Bolivar, 12/17/02 Tr., 74:20–25, 75:1–8; Plaintiff's Exhibit 47). They found that it contained the Fidelio program with all the information which was in the database up to February 22, 2002. (Camacho, 12/20/02 Tr., 15: 11–14).

91. It took approximately 20 minutes to restore the information from the backup to access Fidelio. (Bolivar, 12/17/02 Tr., 75:16–18). After restoring the backup, Bolivar used her user ID and password, and was able to fully access the Fidelio database as it existed on February 22, 2002. (Bolivar, 12/17/02 Tr., 75: 19–23). After

accessing the database, Bolivar was able to retrieve the guest profiles of Robert Amsterdam and Jüan Rodriguez, Four Seasons' attorneys, and print hard copies of them. (Bolivar, 12/17/02 Tr., 76:2–17; Plaintiff's Exhibit 46).

92. Although the Fidelio data that was on the disc related to the Four Seasons Caracas, it also contained confidential information about Four Seasons' global corporate accounts and preferred partners. (Camacho, 12/20/02 Tr., 15: 15–17).

93. After restoring the data, Camacho was able to fully access the Fidelio database and exercise full control over it using an old password belonging to Rosa Bolivar. (Camacho, 12/20/02 Tr., 16:1–3). Bencomo had previous knowledge of Bolivar's old passwords from when he worked for Four Seasons. (Bolivar, 12/17/02 Tr., 25:24).

### The Stolen Data Is Confidential and Proprietary

94. The Court viewed a demonstration conducted by Camacho of the Fidelio database that had been taken by Consorcio, which included various screens of the Fidelio program (and the data contained in each), as well as showing the Fidelio program's capability to generate a variety of management and marketing reports.

95. In an example demonstrated to the Court from the database taken by Consorcio on February 22, 2002, a guest profile existed of the Chief Financial Officer of Chevron Texaco, who had stayed at the Four Seasons Hotel Caracas. (Camacho, 12/20/02 Tr., 32: 3–13). The guest profile indicated that he was married, identified the name of his spouse, listed his passport number, mentioned the fact that he had a pet, including the pet's name, and contained various specific remarks. (Camacho, 12/20/02 Tr., 32: 1425, 33: 1). The remarks included the fact that he was traveling with three children, listed their

names and ages, and also included information about certain complaints that had been lodged by his wife. The guest profile also allowed access to a separate guest history screen which showed information about how many times he had stayed at the Four Seasons Hotel Caracas. (Camacho, 12/20/02 Tr., 33: 15–17). The rate code for the guest stay of the CFO indicated that it was CHEV, making a reference to a negotiated corporate rate code. (Camacho, 12/20/02 Tr., 33: 22–25, 34: 1–3). The rate code indicates that Chevron Texaco was one of the global partners which has a worldwide relationship with the Four Seasons, and which was the source of this particular stay in Caracas. (Camacho, 12/20/02 Tr., 34: 4–6).

96. The demonstration also showed that the Fidelio program contains information about profiles for different corporate partners. These profiles allow access to the history screen which identifies all the different stays that anyone affiliated with that particular corporate partner had taken at the Four Seasons Hotel Caracas. (Camacho, 12/20/02 Tr., 34:10–16). The corporate profile screen provides information as to the total number of room stays and room nights, as well as the revenue which a particular corporate client represents to the hotel. (Camacho 12//20/02 Tr., 34: 14–19). The corporate profile also contains links to the specific guest who stayed, which by following a link would take the user to the specific guest profile of that individual guest. (Camacho, 12/20/02 Tr., 35: 1–2).

97. The Fidelio database identified the various global corporate partners of Four Seasons whose employees stayed at the Hotel Caracas, and had information about the contact person for each corporate partner. A review of the February 22, 2002 Fidelio database identified that these Four Seasons' global corporate partners included, among others, Chevron Texaco, Chev-

ron USA, Exxon Mobil, American Express, Goldman Sachs, Coca–Cola, and Lucent Technologies. (Camacho, 12/20/02 Tr., 34: 1–3, 20–21, 35:6, 14–18, 37: 19–22, 38: 6–9).

98. The Fidelio database which was restored from the disc made from the back-up tapes taken by Consorcio Barr contained 9,894 individual guest profiles, 1,138 corporate profiles, information about 811 travel agents, 84 profiles of group sources, and 71 profiles of group masters. (Camacho 12/20/02 Tr., 38: 19–25, 39: 1–10).

99. The guest history information contained in this database was only specific to the Four Seasons Hotel Caracas. If the system were to try to replicate the guest history information from all the various hotels, it would be too large. (Camacho, 12/20/02 Tr., 42: 22–25; 43: 1–13).

100. In contrast, the guest profiles are stored and shared among all Four Seasons hotels worldwide through the global database. (Camacho, 12/20/02 Tr., 43: 13–14).

101. Specifics of a stay by a particular guest at a particular hotel are not transmitted to the central database, only the guest's profile (including preferences). (Camacho, 1/6/03 Tr., 19: 10–21.) When a new guest goes to stay for the first time at a Four Seasons Hotel, that hotel may download the guest's profile from the central Fidelio database, if he or she had previously stayed at another Four Seasons Hotel. While the profile would indicate that the guest is a previous guest of Four Seasons, it would not have the details of prior stays which were at a different hotel. (Camacho, 1/6/03 Tr., 20: 4–24). This is because the central database would not be large enough to hold all this information. (Camacho, 1/6/03 Tr., 20: 22–24).

### The Caracas Local Network

102. Rosa Bolivar was Manager of Information Technology for the Four Sea-

sons Hotel Caracas. (Bolivar, 12/16/02 Tr., 42: 22–25; 43: 1–2).

103. The IT or Systems Department at the Four Seasons Hotel Caracas consisted of two persons, Rosa Bolivar and an assistant, who was first, Eduardo Bencomo, and then later, Francisco Lafe. (Bolivar, 12/16/02 Tr., 44: 1–7)

104. The functions of a network administrator at the Four Seasons Hotel Caracas included responsibility of network security, providing maintenance for users, providing adequate access to users, making sure that the network was functioning in optimal conditions and regular monitoring. (Bolivar 12/16/02 Tr., 48:1–7).

105. As network administrator, Bolivar was also responsible for maintaining adequate access to files. In other words, Bolivar was responsible for ensuring that only certain people have access to certain files. (Bolivar, 12/16/02 Tr., 48: 15–17).

106. Bolivar's function also included safeguarding the security of any data maintained on the Four Seasons' network and administration of the network in general. (Bolivar, 12/16/02 Tr., 46:5–13).

### The Key Computer Systems of the Hotel

107. The Four Seasons Hotel Caracas had approximately eight (8) servers in operation. The six most important servers were (i) the Lotus Notes server for e-mail; (ii) the Scala server for financial accounting; (iii) the Delphi server for catering and sales; (iv) the Fidelio server for guest management; (v) the Micros server for food and beverage point of sale, and (vi) the Vingcard server for control of the security system for the hotel and access to guestrooms. (Bolivar, 12/16/02 Tr., 66: 1–19).

108. The Lotus Notes server was connected to all of the servers for all Four Seasons' worldwide to allow e-mail communication. Aside from that, it also provided access to Four Seasons' corporate databases which provided other information. For example, the server contained financial information regarding guest occupancy and information regarding the different policies for different divisions and standards. (Bolivar 12/16/02 Tr., 66: 20–25, 67: 1–3). The Four Seasons Caracas Lotus Notes server would replicate itself with the central server in Toronto. (Bolivar, 12/16/02 Tr., 67: 6–14)

109. The databases which were contained on the Lotus Notes server were not local databases but rather belonged to Four Seasons worldwide. Each hotel would provide or feed information into those databases by updating and sharing information so that all hotels would have access to it. (Bolivar, 12/16/02 Tr., 67: 16–23).

110. The databases and the Lotus Notes servers are an integral part of the operations of Four Seasons because the databases contain information on the chain's core standards, information about the way Four Seasons does things, information regarding occupancy data and marketing goals and information regarding finances. Indeed, it is a summary of the most important information shared among Four Seasons personnel at the executive level. (Bolivar, 12/16/02 Tr., 68: 4–10).

111. A user in Caracas would access the Lotus Notes server in Caracas, which had information that had been downloaded by the Lotus Notes server in Caracas from the main server in Toronto. (Bolivar, 12/16/02 Tr., 69:1–6). The server in Toronto gathered all the information from all the hotels worldwide and then through it, each server at each individual hotel is updated and in that manner, the information is shared. (Bolivar, 12/16/02 Tr., 69: 4–8). The Lotus Notes server communicates with the master server in Toronto over the Internet using the Open Reach VPN fire-

wall gateway. (Bolivar, 12/16//02 Tr., 69: 9–21).

112. The Lotus Notes server, as well as the Fidelio server, Scala, Delphi, Vingcard and other servers, were all located in the Systems Office at the Four Seasons Hotel Caracus, which was an area that Four Seasons controlled. (Bolivar, 12/16/03 Tr., 71: 10–22).

113. The servers were placed in the Systems Office because for technical support purposes, it would be easier for Bolivar and her staff to provide support if the hardware was nearby. (Bolivar, 12/16/03 Tr., 71: 23–25, 72: 1–2).

114. The Systems Office was also secure, so these servers were additionally kept in this office for security reasons. (Bolivar, 12/16/02 Tr., 72: 3–8).

115. The network also contained personnel files, files for every division of the hotel and databases for all systems. (Bolivar, 12/16/02, Tr., 48: 10–12).

### The Caracas Intranet

116. The Four Seasons Caracas Hotel also had a local Intranet designed by Bolivar, which contained information about guests and events. This local intranet was only accessible by computers belonging to Four Seasons Hotel Caracas. (Bolivar, 12/18/02 Tr., 70:9–15). In order to access the Four Seasons Hotel Caracas Intranet, the user had to have a valid Four Seasons network log in and network password. (Bolivar, 12/18/02 Tr., 70:16–19).

117. While information on the Intranet contained a guest's name, company, and room, it did not contain all of the information from the guest profile, such as preferences, guest charges and other information. (Bolivar, 12/18/02 Tr., 72:1–13). There were other areas of the Intranet that were only accessible with an extra password, which password was only given to planning committee members and certain of the hotel managers (approximately

15 out of the total 400 employees in Caracas). (Bolivar, 12./18/02 Tr., 73: 16–25, 74: 1–3).

118. The Intranet was a part of Four Seasons' local computer network. (Bolivar, 12/18/02 Tr., 73: 10–12).

### Pre–Opening Network Difficulties

119. Four Seasons had a pre-opening team at the Hotel which was involved in the installation or implementation of the physical computer network at the Four Seasons Hotel Caracas. (Bolivar, 12/16/02 Tr., 49: 15–20). The pre-opening team was responsible for ensuring that the computer systems were ready for the Hotel's opening and for installing missing or needed components. Team members immediately noticed problems. First, the owners had not purchased the required hardware to meet the specifications provided to them. Additionally, the local networks for Consorcio and Four Seasons were integrated into a single network. (Camacho, 12/18/02 Tr., 80: 3–9). This was not in accordance with the specifications that Four Seasons had provided to Consorcio as part of the pre-opening process. (Camacho, 12/18/02 Tr., 81:15–19).

120. In all Four Seasons Hotels, the owners are responsible for providing to Four Seasons all equipment, including computer hardware equipment. (Camacho, 12/20/02 Tr., 11: 19–22; 81: 9–11; Plaintiffs' Exhibit 1). The equipment purchased by Consorcio is for the exclusive use of Four Seasons in operating the Hotel. (Plaintiffs' Exhibit 2, at Section 5.01).

121. Typically, owners are very cooperative in providing this hardware because it is in their best interests to make the hotel operation successful. This however, did not happen in Caracas, where the owners refused to cooperate in providing the hardware specified by Four Seasons. (Camacho, 1/6/02 Tr., 21:14–23).

122. Prior to opening the Four Seasons Hotel Caracas, personnel from Four Seasons Corporate performed an inspection at the site. According to that inspection, a list was compiled which contained all the various furniture, fixtures and equipment that would be necessary to operate the different sections of the Hotel. This list was provided to Consorcio and included a detailed set of specifications and requirements for the Hotel computer systems. (Camacho, 12/20/02 Tr., 43: 2–25, 81:3–8).

123. The Four Seasons' computer system specifications are the fruit of years of experience throughout other hotels, and the hardware listed on the specifications with their particular features gives the best cost-benefit utility and allows the computer systems to work 365 days a year with a minimum of downtime. (Camacho, 12/18/02 Tr., 82:2–6). Minimizing downtime is critical because downtime means guest income is reduced, resulting in a loss to the hotel. (Camacho, 12/18/02 Tr., 82:7–11).

124. After the pre-opening team's initial assessment, Camacho went to meet with Alejandro Soto, the designated Consorcio technical liaison, to ask Consorcio to provide the necessary hardware to allow the Hotel's computer network to operate properly. (Camacho, 12/18/02 Tr., 83:4–8; Bolivar, 12/16/02 Tr., 63: 1–2, 16–25, 64: 1–6, 17–21).

125. In response, Soto rejected Camacho's request, saying that the network was configured the way it was because that is how Consorcio wanted it, and that Consorcio wanted to have access to the Four Seasons network and all its systems. (Camacho, 12/18/02 Tr., 83:9–13).

126. Whenever hardware was needed for the Four Seasons Hotel Caracas, the equipment had to be requested from Lautaro Barrera. Unless Barrera approved the purchase of equipment needed, Four Seasons would not get the equipment. (Bolivar 12/17/02 Tr., 36: 18–23).

127. On several occasions before and during the opening, Four Seasons provided Lautaro Barrera a list of hardware that was needed in the Hotel. (Bolivar, 12/17/02 Tr., 36:7–10). Four Seasons continued to ask for that hardware, but did not receive it. (Bolivar, 12./17/02 Tr., 36 6–10).

128. In none of the other properties where Camacho has been part of the pre-opening team has the owner sought to have access to the Four Seasons' computer network. (Camacho, 12/18/02 Tr.,80:13–15). In fact, Four Seasons has a policy of not providing access to the hotel network to anyone, not even the respective hotel owners. (Camacho, 12/18/02 Tr., 80:16–19).

129. When Camacho was unable to get a resolution from Soto, she raised the problem with Charles Ferraro. (Camacho, 12/18/02 Tr., 83:22–24). Previously, Ferraro had instructed Camacho to notify him if Consorcio attempted to instruct Camacho to do anything which deviated from Four Seasons' policies or standards. (Camacho, 12/18/02 Tr., 83:24–25, 84:1).

130. Four Seasons notified Barrera and Consorcio that the unified network was not in accord with Four Seasons' standards and policies, and that Camacho had contacted Soto to request the hardware needed to separate the networks. (Camacho, 12/18/02 Tr., 85:4–8). Barrera's response was that Consorcio wanted to have access to the Four Seasons network and, at any given time, wanted to be able to go into Fidelio and access the data without having to go through Four Seasons. (Camacho, 12/18/02 Tr., 85: 8–11).

### The Connected Physical Network

131. The decision to create a single physical network to be shared between

Consorcio and Four Seasons was made by Consorcio. (Bolivar, 12–16–02 Tr., 62: 1–8). Four Seasons did not agree with that decision, and communicated that disagreement to Consorcio, as it was against policy for Four Seasons to share the same network with the owners of the Hotel. (Bolivar 12/16/02 Tr., 62: 10–14, 62:15–18). However, through a series of passive-aggressive maneuvers, Consorcio effectively precluded Four Seasons from separating the networks.

132. From the beginning, Consorcio tried to get Four Seasons to be part of their network, as part of the pre-opening office. (Giacometti, 1/7/03 Tr., 20: 14–22). Four Seasons never agreed to be part of Consorcio's network because such integration would have facilitated Consorcio's ability to access proprietary or confidential information that belonged to Four Seasons. (Giacometti, 1/7/03 Tr., 21: 3–8).

133. In December 2000, Four Seasons found evidence that Consorcio had obtained the ability to access Four Seasons' systems. (Ferraro, 1/8/03 Tr., 44: 12–16). Four Seasons' senior executive in charge of opening the Caracas Hotel immediately confronted Consorcio's vice-president, stating "my people tell me you are into our systems, into our computer systems." (Ferraro, 1/8/03 Tr., 45: 21–22; Ferraro, 1/9/03 Tr., 124: 18–21; Camacho, 12/18/02 Tr., 81:15–23, 84:4–13; Giacometti, 1/7/03 Tr., 24: 1–14).

134. In fact, when faced with this accusation, Consorcio's vice-president responded, "So? I'm the owner. I can do anything I want." (Ferraro, 1/8/03 Tr., 45: 23–24; Giacometti, 1/7/03 Tr., 24: 21–25, 25: 1–2). Moreover, Consorcio did not deny the direct accusation that it was "in Four Seasons' computer systems." (Ferraro, 1/8/03 Tr., 46:25, 47: 1–5; Ferraro, 1/9/03 Tr., 134: 22–25, 135:1).

135. Four Seasons then replied that such actions were not proper and in fact were against the law, and instructed its technical staff to do whatever could be done to remedy the situation. (Ferraro, 1/8/03 Tr., 47: 6–25, 47: 1–11).

136. Thus, Consorcio was never given permission to have direct access to the Four Seasons data, and Four Seasons' policy of not allowing anyone outside the Four Seasons organization to have direct access to the data was reiterated to Barrera and Consorcio repeatedly. (Giacometti, 1/7/03 Tr., 27: 2–5, 16–18).

137. At the conclusion of this meeting with Barrera, Consorcio agreed to the separation of the networks. (Camacho, 12/18/02 Tr., 87: 9–10).

### Pre–Opening efforts to Separate the Networks

138. Bolivar and Four Seasons then attempted to try to physically separate the network from Consorcio by, among other things, requesting that Consorcio buy additional hardware which was only for Four Seasons and also by attempting to create a separate private virtual network. (Bolivar, 12/16//02 Tr., 62: 19–25).

139. Camacho met with Soto a few days later and provided a list of the equipment required. (Camacho, 12/18/02 Tr., 87:9–18). Soto tried to impose—as a condition for Consorcio to purchase the equipment required to separate the networks—that Four Seasons provide Consorcio with all the passwords for the systems. (Camacho, 12/18/02 Tr., 87: 23–25, 88:1–5; Bolivar 12/16/02 Tr., 65: 15–24). Soto was particularly interested in the password to the Vingcard server, which controlled the electronic keys. (Camacho, 12/18/02 Tr., 88:4–5).

140. Camacho immediately notified Ferraro of the new condition Consorcio was trying to impose, and as a result, Ferraro called another meeting with Lau-

taro Barrera. (Camacho, 12/18/02 Tr., 88:8–13). At that meeting, Four Seasons again reiterated it would not provide Consorcio with access to its network or databases. (Camacho, 12/18/02 Tr., 88:16–18).

141. Four Seasons then instructed Camacho to use all efforts possible to separate the Four Seasons and Consorcio networks. (Camacho, 12/18/02 Tr., 88:19–22). Camacho then created separate VLANs (logical networks) to prevent further access by Consorcio to the Four Seasons network. (Camacho, 12/18/02 Tr., 90:2–15).

### Four Seasons' Network Security Protocols

142. Each Four Seasons' authorized user has a specific access level associated with his or her ID. Once the ID is validated with a password, the user can see detailed information on the network. (Bolivar, 12.16.02 Tr., 68: 18–22). Approximately 150 of the 400 employees of the Four Seasons Caracas Hotel had a network user ID account. Each ID account had different rights depending on the function or work that the employee performed for the company and also depending on the position he or she held. (Bolivar, 12/16/02 Tr., 72: 20–25, 73: 1).

143. The individual employee's superior was responsible for sending a request to the network administrators indicating what level of access the employee needed, and based upon that request, either Bolivar or Bencomo would create the new user's account and assign to that user the appropriate access rights. (Bolivar, 12/16/03 Tr., 73: 4–10).

144. For a typical employee to access the Four Seasons network, such as an assistant manager of the front desk, he or she must first log into the Four Seasons network by typing in a valid log in and password. Once he has access to the network, he then has available to him access to different applications. (Bolivar, 12/17/02 Tr., 32:6–13).

145. Access to the Fidelio software program also requires a user name and password, and that password is different from the network password. (Bolivar, 12/17/02 Tr., 32: 14–19). The employee's e-mail account password would not necessarily be the same as either the Fidelio application or the network log in. (Bolivar 12/17/02 Tr., 32:20–23). Bencomo, as part of his duties when he was assistant manager, learned how to set up users for the network and applications. In so doing, he would obtain information from the individual employee as to what they wished their passwords to be and then he would set their passwords on the system. (Bolivar, 12/17/02 Tr., 32: 24–25, 33: 1–17).

146. All access by Four Seasons' employees, however, was subject to the Four Seasons' Electronic Systems Policy and to the Management of Confidential Information policy. (Plaintiffs' Exhibits 23 and 24).

147. Four Seasons has a company wide policy regarding employees having access to proprietary and confidential information. (Giacometti, 1/7/03 Tr., 25: 25, 26: 1–2). Each employee, including general managers of the hotel must sign a confidentiality agreement when they start working with the company, which advises them in writing that all information that they have access to cannot be shared with any third party. (Giacometti, 1/7/03 Tr., 26: 3–7; Bolivar, 12/16/02 Tr., 44: 12–25, 45: 1–12; Camacho, 12/18/02 Tr., 85:17–20, 86: 6–13; Plaintiffs' Exhibit 23). This policy is company wide. It is enforced in every hotel and is not specific to Caracas. (Giacometti, 1/7/02 Tr., 26: 8–9).

148. The purpose of the electronic systems policy is to inform Four Seasons' employees that they handle private information which only hotel employees should

handle, and thus, is an effort to safeguard the secrecy of such information. (Bolivar, 12/16/02 Tr., 46: 1–4).

149. Four Seasons continually enforces this important confidentiality policy because individual guests provide a great deal of personal information and those guests expect Four Seasons to maintain the confidentiality of that information. The policy is also important because if Four Seasons were to no longer operate a specific hotel, the information contained in those databases would be valuable to the owner who might want to transmit that information to a new operating company for that hotel. (Giacometti, 1/7/03 Tr., 26: 10–22). This would have a direct negative impact on Four Seasons, because it would result in a loss of business for Four Seasons, as well as loss of trust from the various guests, suppliers, vendors and entities that Four Seasons does business with. (Giacometti, 1–7–03 Tr., 26:23–25, 27: 1).

150. Bencomo was aware of Four Seasons' corporate wide electronic systems policy and confidential information policy, as it was a frequent topic of conversation. Indeed, it was the responsibility of various systems personnel, including Bencomo, to make sure that information was maintained securely and to further ensure its integrity. (Camacho, 12/20/02 Tr., 5: 21–25, 6: 1–6).

151. Four Seasons views the information which guests share with Four Seasons as confidential and given to Four Seasons, not to any hotel's owner, such as Consorcio. (Camacho, 12/18/02 Tr., 85:12–15). Indeed, a guest is normally totally unaware of an owner's role or even identity at a particular hotel.

152. Additionally, the Four Seasons Hotel Caracas, and other Latin American Four Seasons Hotels, had a policy to protect the safety and integrity of their confidential information which had been translated into Spanish. This Spanish policy had to be read and signed by all Hotel employees upon being hired by the Hotel acknowledging that they would adhere to the policy. (Bolivar, 12/16/02 Tr., 46: 22–25, 47: 1–4; Camacho, 12/18/02 Tr., 87: 2–4; Plaintiffs' Exhibit 24). The Spanish translation (Plaintiffs' Exhibit 24) is used at the Four Seasons hotels in Mexico, Caracas, Buenos Aires—all the Spanish-speaking Four Seasons. (Camacho, 12/18/02 Tr., 86:22–25, 87:1).

### The Hotel's Network Configuration after Opening

153. Plaintiffs' Exhibit 21 accurately reflects the layout of the computers at the Four Seasons Hotel Caracas. (Bolivar, 12/16/02 Tr., 51:13–16).

154. Plaintiffs' Exhibit 21 shows that the hardware was divided into several sections: inside an oval on that exhibit is the room where the main hardware used to communicate with the network is located. Included in this hardware is the 3Com switch, the main backbone that provided communication with the rest of the connections in the Hotel.

155. Equipment in the communications room also provided Internet access for the Hotel. Exhibit 21 includes a red box that indicates a firewall, which is a standard requirement for Four Seasons. (Bolivar, 12/16/02 Tr., 52: 6–14). This firewall, the OpenReach VPN Gateway, is part of the global Four Seasons' network and allows access to information for all of Four Seasons as well as allowing communications between the Four Seasons Hotel Caracas and other Four Seasons Hotels. (Bolivar, 12/16/02 Tr., 52: 15–19).

156. Thus, inside the communications room (which was exclusively under Consorcio's control) were the Open Reach VPN Gateway as well as the 3Com switch and the Cisco router, all of which were important elements of the Four Seasons'

computer network. (Bolivar, 12.16.02 Tr., 55: 2–6, 15–21).

157. The 3Com Switch contained in the communications room, sometimes also referred to as the backbone, was the hardware through which access was given to all the floors of the hotel as well as the means by which Internet access was shared. Each floor of the hotel typically had a hub or a switch which was connected to the backbone and then from that local switch or hub on each floor, connections were made to individual computers. (Bolivar, 12/16/02 Tr., 60: 7–25, 61: 1–6). Four Seasons requested control of the backbone, but this was refused by Consorcio. (Camacho, 12/20/02 Tr., 11: 5–9).

158. After September 2001, Four Seasons did not have unrestricted access to the communications room, but rather would have to write a letter to Lautaro Barrera requesting permission and await such permission before being able to gain entry into the communications room where these devices were physically situated. (Bolivar, 12/16/02 Tr., 55: 7–14).

159. The request for authorization for access to the communications room would sometimes take several days, and sometimes Four Seasons was completely denied authorization by Consorcio to access the communications room. (Bolivar, 12/16/02 Tr., 56: 7–11).

160. Not having physical access to the communications room deteriorated the network security of the Four Seasons Caracas Hotel because the systems administrator had no control over the hardware and could not give a response to any threat. (Bolivar 12/16/02 Tr., 56: 1–7).

161. Despite requests for more liberal access to the communications room, such access was never granted by Consorcio. (Bolivar, 12/16/02 Tr., 56: 12–16).

162. The existence of a communications room that is separate and apart from the Systems Office is strange. In fact, Bolivar stated that the only Four Seasons hotel in the world that has such a set up is the Caracas hotel. In all other hotels which Bolivar has visited, the Systems Manager always has free access to the computer hardware, which is not the case in Caracas. (Bolivar, 12/18/02 Tr., 64:2–10).

### Events Which Led Four Seasons To Believe Its Network Was Being Violated

163. In July or August, 2001, there was a week when several members of the planning committee for the Four Seasons Hotel Caracas (the director for human resources, the engineering director, the director for rooms, director for food and beverage and the general manager) approached Bolivar and said that they believed that their e-mails were first being read by someone else. (Bolivar, 12/17/02 Tr., 16: 13–21, 17:6–10).

164. After being contacted by the planning committee members, Bolivar undertook a security check of the network, which included checking Bencomo's computer. (Bolivar, 12/17/02 Tr., 17: 21–25, 18: 1).

165. Bencomo's computer was checked because he had formerly been an employee of Consorcio, so Bolivar thought a logical first step would be to look there and see if there was anything unusual. (Bolivar, 12/17/02 Tr., 18: 11–22). Bencomo and Consorcio always had a very close relationship, and on several occasions it even appeared that Bencomo was, if not afraid of Consorcio, certainly inclined to give in to pressure from Consorcio easily. (Bolivar, 12/18/02 Tr., 65: 21–25). On several occasions, both Bolivar and Camacho made it clear to Bencomo that he was an employee of Four Seasons and subject to the electronic systems policies and confidentiality

policies of the Hotel. (Bolivar, 12//18/02 Tr., 20:16–22, 66: 23–25, 67: 1–2).

166. When Bolivar checked Bencomo's computer, she found that Bencomo had a printer installed that belonged to Consorcio. (Bolivar, 12/17/02 Tr., 18: 23–24).

167. The installation of the Consorcio printer was against Four Seasons' policy to protect the private information of Four Seasons. (Bolivar, 12/17/02 Tr., 18:24–25 19:1).

168. Bencomo also had the NetBEUI protocol installed on his computer, even though he was aware that the Four Seasons Hotel Caracas had a policy that prohibited the NetBEUI protocol on Four Seasons' computers. (Bolivar, 12/17/02 Tr., 19:22–25, 20:1–3, 12–15).

169. At the time, Bencomo had total access to the Four Seasons local network, which meant that he could see the files for any person, even the general manager. It also meant he could have access to any of the applications and could see all of the data, including e-mails. (Bolivar, 12/16/02 Tr., 74: 2–6).

170. Bolivar became concerned about the network security because given Bencomo's access and authorization, the presence of the NetBEUI protocol, and the fact that a Consorcio printer was attached to his computer, Bencomo could print out any of these documents belonging to Four Seasons up to the highest executive levels of the hotel. (Bolivar, 12/17/02 Tr. 21: 9–17).

171. Four Seasons policy states that employees cannot provide information to third-parties, even a Hotel's owners. Rather, Four Seasons' employees are required by policy to refer the Owner's request for information to the General Manager. (Bolivar, 12/17/02 Tr., 23: 1–11).

172. As a result of finding that printer and other matters, Bolivar recommended that Bencomo be fired. (Bolivar, 12/17/02

Tr., 23: 15–23). Ultimately, Bencomo was terminated. The very next day, Bencomo began working for Consorcio. (Henry, 1/10/03 Tr., 26: 3–8; Bolivar, 12/17/02 Tr., 46: 9–14).

173. Subsequent to Bencomo's termination, the relationship between Four Seasons and Consorcio underwent a profound change. After Bencomo was fired, Bolivar found it difficult if not impossible to do her work. In fact, subsequent to his termination, she only recalls being able to access the communications room twice. (Bolivar, 12/17/02 Tr., 45:18–25).

174. Following Bencomo's termination, Four Seasons took various steps to tighten security, including changing all the administrative passwords for the various sections of the network and tried to reinforce or strengthen the security policies for the network. Another feature was enabled whereby on a third incorrect attempt to guess or input a password, system access would be denied and the user's ID locked out. Additionally, Four Seasons lengthened all passwords and encrypted all e-mails. (Bolivar, 12/17/02 Tr., 31: 6–15).

175. This feature was triggered in October and November 2001, when Bolivar's administrative user password was constantly being blocked (which only happens when a program is being used to try to guess or figure out the password by constantly trying different variations). (Bolivar, 12/17/02 Tr., 44: 8–20).

176. As part of the effort to try to secure the network, Bolivar had to spend a considerable number of hours, often 12 hours a day, every day including weekends, to help train users in the changing of passwords, as well as performing her duties monitoring the network. (Bolivar, 12/17/02 Tr., 47: 11–23).

177. Even though the network passwords changed, the network user ID's

were not changed. (Bolivar, 12/17/02 Tr., 31: 22–25).

178. In addition to the steps taken at the administrative level to tighten the network security, policy changes were implemented to try to improve network security. (Bolivar, 12/17/02 Tr., 34: 24–25, 35: 1–6).

179. A review of all the individual user's permissions and rights for the network was conducted to make sure that they were appropriate for each individual user. (Bolivar, 12/17/02 Tr., 35: 7–13).

180. In addition, Four Seasons also checked some of the various hookups to the different switches, which included checking the communications room. (Bolivar 12/17/02 Tr., 37:25–38, 1–7).

181. As the Systems Manager in Caracas, Bolivar was familiar with the inventory and equipment of the Four Seasons Hotel and therefore, by looking at any network utility that identifies devices on the network, Bolivar could determine whether or not a particular device was or was not part of the Four Seasons inventory. (Bolivar, 12/18/02 Tr., 65:4–14). When Four Seasons monitored the network, they saw that one specific connection which had been present the day before had disappeared. Bolivar became concerned because she knew that none of her hardware was missing, which led her to the conclusion that someone else's hardware had been connected to the Four Seasons network. (Bolivar, 12/17/02 Tr., 38: 8–13).

182. Four Seasons identified three areas which were important in order to make the network secure: 1) have control over the backbone, 2) all areas of the hotel must have adequate hardware to support the VLAN (i.e. programmable switches), and 3) the connection to the Internet for the Consorcio network must be different or independent from that of the Four Seasons network. (Camacho, 12/20/02 Tr., 10: 20–25, 11: 1–4).

183. When Four Seasons requested control of the backbone, Consorcio refused. (Camacho, 12/20/02 Tr., 11: 5–9).

184. Four Seasons requested additional computer equipment to allow more precise segregation of the networks, but Consorcio refused to provide that equipment. (Camacho, 12/20/02 Tr., 11: 13–18).

185. On several occasions, Four Seasons requested that Consorcio provide a separate Internet connection for Four Seasons. Those requests were also refused. (Camacho, 12/20/02 Tr., 11: 10–12).

186. The party responsible for the Internet connection was the owner. Therefore, it was Consorcio's responsibility to provide the separate Internet connection. (Camacho, 1/6//03 Tr., 9:19). Consorcio could have complied with Four Seasons' request to have an independent access to the Internet by implementing a router that had two separate outlets which would have been an inexpensive alternative to getting a second Internet connection. (Camacho, 12/20/02 Tr., 55: 16–20). To do this, all they would have had to do was add a card to the router that was already present which would have two outlets on it. (Camacho, 12/20/02 Tr., 58: 1–2). However, later when Four Seasons wanted to do it and pay for it out of its own pocket, Consorcio did not allow them to do so. Consorcio blocked this by not allowing the Internet service provider access to the communications room to install any connection. (Camacho, 1/6/03 Tr., 15: 19–25, 16: 1–6).

187. The card to allow two separate, independent Internet connections out of the router would have cost anywhere between $250.00 and $1,000.00, but Four Seasons did not have the option of being able to install it on its own. (Camacho, 1–6–03 Tr., 18: 11–17). The Internet router was located in the communications room, which was controlled by Consorcio.

188. Four Seasons insisted that the hubs be replaced with programmable switches because programmable switches can have individual ports deactivated. In contrast, however, hubs are open and if a hub is in an area which is not physically secured, an unauthorized person can plug in to the hub's open port. This presented a security problem. Accordingly, Four Seasons wanted to change the hubs to programmable switches. (Camacho, 1/6/03 Tr., 26: 1–25 27: 1–3).

189. The September 2001 incidents were not the first problems involving Consorcio's interception of Four Seasons' communications. There were also two specific instances where Giacometti (the pre-opening General Manager) complained to Consorcio concerning interception of communications directed to him or to Four Seasons whether by mail or otherwise.

190. The first incident was in February 2000, and involved marketing materials, referred to as Information Fact Sheets, which had been addressed to the Hotel's director of Marketing. Carlos Barrera, however, intercepted and opened the package. The second incident involved invoices that had come in envelopes addressed to Giacometti which had again been opened by Consorcio. (Giacometti, 1/7/03 Tr., 21: 14–25, 22: 1–25, 23: 1–3).

191. As a result of these instances, Giacometti called a meeting with Consorcio and addressed the issue of interception of communications with both Carlos Barrera and Lautaro Barrera. Giacometti demanded that Consorcio not open any more packages or mail addressed to either Four Seasons or any employee of the Four Seasons Hotel Caracas. (Giacometti, 1/7/03 Tr., 23: 4–14).

192. There were also concerns about the integrity of telephone communications. Consorcio controlled the telephone system, and Four Seasons did not have access to the telephone room. These factors, when taken together with the other concerns regarding Consorcio wanting to force Four Seasons to be on the same computer network, and the incidents involving interception of mail and packages, led Giacometti to believe that the telephone system was not secure. (Giacometti, 1/7/03 Tr., 23: 15–24).

193. On several occasions, Soto, Lautaro Barrera's assistant, asked Camacho for information regarding hacking. (Camacho, 12/20/02 Tr., 8: 10–15; Bolivar, 12/17/02 Tr., 25: 4–11). These conversations regarding hacking occurred on at least three separate occasions, and on other occasions, he was very interested and wanted to know about programs which existed for cracking passwords. (Camacho, 12/20/02 Tr., 9: 2–9). Camacho did not provide him with information about how to crack passwords, but rather tried to guide his interest to more productive topics such as network security. (Camacho, 12/20/02 Tr., 9: 17–24).

194. The fact that Lautaro Barrera's assistant was interested in hacking caused Bolivar to be concerned about network security particularly given the fact that there was a shared network. It worried Bolivar to have someone on the other side of the network who was very close to Bencomo, the Assistant Systems Manager. Bolivar was concerned that these individuals might gain access to proprietary information. (Bolivar, 12/17/02 Tr., 25: 12–18).

### Consorcio Had The Motive, Means and Opportunity

195. Bencomo had knowledge of L0phtCRACK, a computer program used to crack passwords, among other things. (Bolivar, 12/17/02 Tr., 24: 15–24).

196. Bencomo had a considerable amount of information which would pertain to and affect network security, as he knew all of the security standards and policies,

knew the Four Seasons IP addresses, knew how the network was configured, had all the administrative passwords or the passwords for the managers, and also had Bolivar's password. (Bolivar, 12/17/02 Tr., 25: 19–25).

197. Even Consorcio's computer expert conceded that Bencomo had full access to Four Seasons' network while he worked for Four Seasons as an Assistant Systems Administrator. (Peña, 1/22/03 Tr., 93: 10–23).

198. The fact that Bencomo had knowledge of the IP addressing scheme and/or valid ranges of the Four Seasons network made it easier for him to masquerade as a computer that belonged on the Four Seasons network. (Bolivar, 12//17/02 Tr., 26: 7–25). In fact, to be able to access certain portions of the Four Seasons computer network, the computer that was attempting to originate the access would have to be identified with an IP address within a specific range. (Bolivar, 12/17/02 Tr., 27: 12–23).

199. For someone with the capabilities of an assistant systems manager, it would take Bencomo approximately three minutes to change the IP address in the computer so that it could fit within the valid range. (Bolivar, 12/17/02 Tr., 29:11–22).

200. By changing the IP address of any Consorcio computer, and hooking it up to one of the Four Seasons hubs at some hour of the night, Consorcio would have had access to Fidelio. All they would have to do was use the user ID and password of a Four Seasons employee. (Bolivar, 12/17/02 Tr., 72: 13–24).

201. Utilizing the valid network IDs (many of which Bencomo knew) and the L0pthCrack program which Bencomo had previously installed in his computer, it would have been possible for Bencomo to crack the passwords that were associated with those valid network user IDs, and thereby gain access to proprietary Four Seasons' data. (Bolivar, 12/17/02 Tr., 34:3–22).

### Bencomo's Training

202. Bencomo's training as an Assistant System's Manager for Four Seasons included how to install network equipment, control switches and hubs, how to set up network accounts and other accounts, and knowledge of how to install new computers with various Four Seasons' applications. This training also included detailed information about the structure of the network, as well as how to administer various Four Seasons software applications. (Camacho, 12/20/02 Tr., 4: 11–17). The main applications utilized by Four Seasons are Fidelio, Micros, Scala, and Lotus Notes. (Camacho, 12/20/02 Tr., 4: 18–22).

203. Bencomo also had training on how to configure ports on the Four Seasons portion of the VLAN, as well as Consorcio's portion of the VLAN. (Camacho, 12/20/02 Tr., 6: 10–13).

204. Because the two companies were on the same physical network, the principal line of defense for separation between the Four Seasons computer network and the Consorcio computer network was the VLAN. (Camacho, 12/20/02 Tr., 6: 14–18). The fact that someone (Bencomo) who had been trained to configure the VLANs suddenly went into the employ of the other party, in this case Consorcio, made the Four Seasons' computer network more vulnerable to penetration. (Camacho, 12/20/02 Tr., 6: 19–22, 7: 1–6).

205. After Bencomo was fired, Lautaro Barrera came to Bolivar's office and asked to borrow Bencomo's computer for a couple of days. The computer was never returned. (Bolivar, 12/17/02 Tr., 30: 2–5).

206. Bolivar sought the return of the Dell Optiplex computer, which had been assigned to Four Seasons and in spite of

requests from Four Seasons, Consorcio did not return it until ordered to do so by the Court. (Bolivar, 12/17/02 Tr., 30:11–20).

207. Bencomo's computer had installed on it Fidelio and Lotus Notes. (Bolivar, 12/17/02 Tr. 31: 3–5). These applications would have made it easier to access Four Seasons' data.

208. In around October 2001, at approximately the same time Bencomo was terminated as an MIS employee of Four Seasons and hired back by Consorcio, Consorcio was in discussions with a prominent competitor of Four Seasons in the worldwide luxury hotel market concerning replacing Four Seasons as the operator of the hotel. (Barrera, 1/21/03 Tr., 97: 1–12).

209. Consorcio engaged in additional discussions with other hotel operators competitive with Four Seasons in the early part of 2002. (Barrera, 1/21/03 Tr., 97: 16–25, 98: 1–10).

210. Consorcio filed a lawsuit in Venezuela seeking to terminate its Management Agreement with Four Seasons in February 2002. (Barrera, 1/21/03 Tr., 99: 16–25, 100: 1–24).

211. As explained by Four Seasons' hospitality industry expert, the Fidelio database and other confidential data of Four Seasons would represent a substantial value to Consorcio when seeking Four Seasons' replacement. (Claver, 1/13/03 Tr., 5: 16–22). Indeed, an owner such as Consorcio with possession of an existing customer base (from the Fidelio database) could receive millions of dollars from a competing hotel operator in exchange for a long term contract. (Claver, 1/13/03 Tr., 6: 14–21).

### Forensic Examination Reveals Access

212. John Ashley is an expert in forensic computer analysis and electronic evidence. Ashley's experience dates back to 1989 and includes approximately 11 years experience in law enforcement and approximately 3 years experience in private prac-

tice. (Ashley, 1/7/03 Tr., 88: 2–3, 89: 4–9, 10–25, 90: 1–24).

213. Ashley was initially engaged by Four Seasons to create images (copies of the hard disk drives) of two specific computers, one laptop and one desktop, for analysis to determine whether or not they contained any of Four Seasons' proprietary information. (Ashley, 1/7/03 Tr., 92: 16–25, 93: 1–12).

214. Later, Ashley went back and dug deeper to identify any information which supported Four Seasons' claims that hacking attempts had occurred on their network. (Ashley, 1/7/03 Tr., 93: 15–23).

215. Ashley undertook an examination of one of the computers (Bencomo's Dell Optiplex) to determine whether or not it had been used subsequent to March 13, 2002 in violation of an order of the United States Magistrate Judge. (Ashley, 1/7/03 Tr., 93: 24–25, 94: 1–7).

216. Ashley's investigation included various interviews with Bolivar based upon the fact that she had personal knowledge of many of the facts which Ashley needed to determine concerning the technical structure of the network, what the network topography would have been, as well as other information which would have assisted Ashley in his investigation. In addition, Ashley sought from Bolivar information as to what role Bencomo had in the organization at the time he was working with her at Four Seasons, what Bencomo's level of knowledge was, what Bencomo's actual administrative rights were, and the passwords Bencomo had access to. (Ashley, 1/7/03 Tr., 95:3–25, 96: 1).

217. Ashley's investigation revealed that Bencomo had total access, as he had been Bolivar's direct assistant and had the right to grant permissions. This also means Bencomo had known many of the

users' passwords. (Ashley, 1/7/03 Tr., 96: 4–6).

218. Ashley also reviewed the testimony under oath of both Bolivar and Bencomo in this trial and in previous proceedings in formulating his opinions and conclusions. (Ashley, 1/7/03 Tr., 94:5–25).

219. Based upon his investigation, Ashley concluded in his expert opinion that next to Bolivar, Bencomo knew the Four Seasons network better than anyone. In fact, Bencomo had been there throughout the hotel's development as an administrator and was aware of how the network was configured and how it worked. Bencomo knew that both companies were actually on the same physical network. (Ashley, 1/7/03 Tr., 96: 7–16).

220. Ashley testified that prior to beginning his analysis, he engaged in bit stream duplication, which was done because one of the basic principles of forensics is to not alter the data that you are actually investigating. Therefore, Ashley first made an image copy of the hard drive to be examined, and then all investigation was done on the image copy. (Ashley, 1/7/03 Tr., 97: 4–12).

221. To undertake the analysis, Ashley used two separate forensic software packages: Vogon, which is widely used throughout Europe and which software program Ashley was involved in the development of during the 1990's; and Encase, which is a major forensic computer software package used in the United States. (Ashley, 1/7/03 Tr., 97:13–17).

222. The first step that Vogon undertook was to build a key word search dictionary which allowed the investigator to examine all of the data using certain key words or terms. (Ashley, 1/7/03 Tr., 97: 22–25). Additionally, the process also automatically recovers all deleted files capable of recovery on the drive. (Ashley, 1/7/03 Tr., 97: 25, 98: 1–2).

223. As a result of this investigation, Ashley found a number of messages that had been posted to a Linux list serve. A list serve is widely used in technical areas where somebody is trying to get information regarding particular technical issues. You can post your question to the list serve and different technical administrators normally respond. The questions posted by Bencomo appeared to be asking for explanations he could use to justify why certain network activity had occurred. (Ashley, 1/7/03 Tr., 100: 12–25).

224. Ashley's investigation also revealed that undeletion software had been put on the machine after March 13, 2002. This is significant because somebody was apparently trying to use the software. It appeared that the user was experimenting, trying to use the software to see what the results would be and how well it would recover deleted information. Ashley opined that someone was trying to establish whether or not data which was deleted, could subsequently be recovered. (Ashley, 1/7/03 Tr., 99:12–25, 100: 1–8).

225. Ashley also found information on the list serve messages that Bencomo had posted which contained information about a Trojan Horse sub-seven hit. (Ashley, 1/7/03 Tr., 101: 1–7).

226. A sub seven Trojan horse is a method widely used by hackers to gain access to networks. Hackers have automated programs that will scan across the Internet trying to find a port that is vulnerable. If a Trojan Horse sub seven has been planted, it becomes a key to unlock the door into a computer network and when the hacker returns he can turn the key, get into the network and gain access to the data contained within the network. (Ashley, 1/7/03 Tr., 101: 6–18).

227. Ashley also found a considerable number of deleted e-mails, which he was

able to recover. (Ashley, 1/7/03 Tr., 101: 19–21).

228. Bencomo's computer had used two specific e-mail packages, Microsoft Outlook and Microsoft Outlook Express. (Ashley, 1/7/03 Tr., 101:22–24).

229. Based upon Ashley's examination, it appeared that both e-mail programs were being used for different purposes: Microsoft Outlook was being used predominantly for business-related messaging, and Microsoft Outlook Express was being used for personal messaging, transferring of files, etc. (Ashley, 1/7/03 Tr., 102: 1–7).

230. Bencomo had previously tried to explain that one of the reasons for going back and accessing the computer after the March 13, 2002 hearing was to secure or safeguard his personal information. Ashley's examination, however, revealed that this explanation was false, as Bencomo's personal information was still there, including textual content of some of the messages, and attachments to e-mail files of a pornographic nature. Based upon Ashley's examination, it appeared that all of Bencomo's personal e-mails were still present. (Ashley, 1/7/03 Tr., 102: 11–25).

231. In contrast, however, Ashley determined that Bencomo had deleted several of the business e-mails. (Ashley, 1/7/03 Tr., 103: 1–3).

232. Ashley was able to recover a total of 92 e-mails which had been previously emptied from the deleted items folder of Outlook. (Ashley, 1/7/03 Tr., 103: 13–16). The significance of the fact that the deleted items folder had been emptied indicated to Ashley that the user was trying to make sure that nobody would be able to retrieve those prior e-mails. (Ashley, 1/7/03 Tr., 103:17–22).

233. Based upon his analysis, Ashley reached the opinion that the e-mails in question were deleted on March 14, 2002, after the Magistrate Judge had ordered

that the computer in question not be accessed. (Ashley, 1/7/03 Tr., 104: 3–24).

234. Of the 92 recovered e-mails, 38 of them contained encrypted spreadsheet files attached to them. (Ashley, 1/7/03 Tr., 105:5–12).

235. Utilizing a system of 25 powerful computers to carry out what is called a distributed network attack against the file whose password was encrypted, Ashley was able to crack the password of the first file. (Ashley, 1/7/03 Tr., 105: 17–25). It took between two to three weeks to complete the decryption of all 38 files. (Ashley, 1/7/03 Tr., 106: 1–2).

236. Ashley generated a report which was a printout of the contents of the e-mails that he had been able to decrypt. (Ashley, 1/7/03 Tr., 106: 3–5; Plaintiffs' Exhibit 26A). Based upon this examination of the 38 spreadsheets, Ashley concluded that the 38 e-mails contained Four Seasons' data that had been located on Bencomo's Dell Optiplex drive. (Ashley, 1/7/03 Tr., 106"22–25, 107: 1–2.)

237. Bencomo had previously testified under oath that he used to delete his e-mail files on a daily basis, after he no longer needed them. Ashley's examination of the Dell Optiplex however, contradicted this explanation and supported a mass deletion as opposed to a daily one. (Ashley, 1/7/03 Tr., 107: 3–16).

238. The e-mails in questions were daily, starting on January 3, 2002 and proceeding to February 26, 2002. Nearly all appeared to have been created early in the morning, approximately around 8:00 a.m. (Ashley, 1/7/03 Tr., 107: 19–24).

239. The e-mails in question were all sent by Bencomo to Lautaro Barrera. (Ashley, 1/7/03 Tr., 108: 1–10).

240. Additionally, Ashley was aware of the incidents where five members of the planning committee, at approximately the

same time, complained that their Lotus Notes e-mails appeared to having been read before they received them. (Ashley, 1/7/03 Tr.,109:1–8). Based upon his familiarity with Lotus Notes, and the fact that there were five separate e-mail users all within a matter of two or three days, who were making the same complaint, it was Ashley's conclusion that the review of the e-mail was not occurring at the client level (i.e. on each desktop computer) but rather that it was occurring on the server where the e-mails were stored. (Ashley, 1/7/03 Tr.,109:15–23). Based upon Ashley's examinations and review of facts, he formulated the opinion that Bencomo had the requisite level of access and knowledge in order to be the one who was accessing the e-mails of the planning committee members. (Ashley, 1/7/03 Tr., 110:1–17).

241. In addition to the above, Ashley found NetBEUI and L0phtCrack on Bencomo's computer. (Ashley, 1/7/03 Tr., 110:18–25,111: 1)

242. NetBEUI is a protocol that is used mostly on smaller networks. (Ashley, 1/7/03 Tr., 110:18–25,111: 1; Camacho, 1/6/03 Tr., 8:1–9). If someone was utilizing the NetBEUI protocol across the networks that had knowledge of how the other network was configured, it would be much easier for that person to hack into the network. (Camacho, 1/6/03 Tr., 25: 6–10). Bencomo had precisely that knowledge. (Camacho, 1/6//03 Tr., 25: 11–12).

243. Four Seasons uses the TCP/IP protocol, which is a more secure protocol and is used mainly by larger corporations and large corporate networks. (Ashley, 1/7/03 Tr., 111: 6–13, 114: 10–20).

244. The big difference between the NetBEUI protocol and TCP/IP is that the NetBEUI protocol is non-trackable. There is not an origin or destination of packets with NetBEUI, whereas TCP/IP (used by Four Seasons) always has a desti-nation and always guards the origin data. (Camacho 1/6/02 Tr. 24: 1–4).

245. Four Seasons had a policy not to use NetBEUI, instead they used the TCP/IP protocol. (Ashley, 1/7/03 Tr., 111: 2–5). The presence of the NetBEUI protocol on a Four Seasons network computer would make the Four Seasons network less secure because it would provide a direct means of communication between that computer and the NetBEUI network, in this case Consorcio's network. (Ashley, 1/7/03 Tr., 111: 14–25, 112: 1–8).

246. The presence of the NetBEUI protocol would make it easier for Four Seasons information to be printed out to a Consorcio printer from a Four Seasons computer. (Ashley, 1/7/03 Tr., 113: 1–6). Moreover, the presence of the NetBEUI protocol would make it very hard, almost impossible, for Four Seasons to determine whether or not data, such as Four Seasons' confidential information, was in fact being sent to a Consorcio printer. (Ashley, 1/7/03 Tr., 113:7–11).

247. L0phtCrack is a program which was developed by a hacking group called L0pht Heavy Industries in the mid 1990's and widely used by hackers that usually gather users' passwords on networks. (Ashley, 1/7/03 Tr., 115:13–19). It gathers passwords and cracks them across Windows networks. Once a hacker has gained access to a network, one of the things he needs to go through is the actual password protection. Having the actual password allows him to get into network and move around. (Ashley, 1/7/03 Tr., 113: 20–25).

248. While L0phtCrack is occasionally used by network administrators, its principal use is by hackers to crack passwords. (Ashley, 1/7/03 Tr., 114:1–9). In Ashley's opinion, based upon the capabilities of the L0phtCrack program and given Bencomo's knowledge of the layout and design of the Four Seasons network and his knowledge

of valid user IDs, Bencomo had most of the integral parts needed to allow him to crack passwords on the Four Seasons networks after he left the company. (Ashley, 1/7/03 Tr., 114: 10–20).

249. Lastly, spoofing is forging an IP address so that when a person receives a data packet or communication they believe it is coming from somewhere else. (Ashley, 1/7/03 Tr., 115:13–16). Often times, the person attempting to gain access to a network does not want it to be traceable back to their own IP address, so they spoof an address. (Ashley, 1/7/03 Tr., 115:17–20). Additionally, some networks restrict access based upon a requirement that the computer seeking access have an IP address within a certain valid range, using an access control list. In order to gain unauthorized access to the network, it would be essential to spoof an IP address. (Ashley, 1/7/03 Tr., 115: 21–25, 116: 1–5).

250. Based upon Ashley's analysis and investigation, Bencomo had both the requisite skill to spoof, and also the knowledge as to the valid IP addresses needed in order to access the Four Seasons network. (Ashley, 1/7/03 Tr., 116: 6–17). Spoofing is not difficult, there are many ways to do it, and there is even software widely available on the Internet to assist with the process. (Ashley, 1/7/03 Tr., 116: 18–21).

### Consorcio's Spoliation of Evidence

251. On March 15, 2002, Ashley was in court when Magistrate Judge O'Sullivan ordered that Consorcio Barr deliver the Dell Optiplex for examination, and that no one associated with Consorcio have any further access to the computer. (Ashley, 1/7/03 Tr., 117: 21–25, 118: 1–6).

252. Ashley engaged in a subsequent examination of the Dell Optiplex and determined that in contravention of the March 13th order, the Dell Optiplex had been widely accessed.

253. Ashley generated a number of spreadsheets, detailing the specific nature of the access to the Dell Optiplex computer subsequent to March 13 and prior to its turnover for examination. Plaintiffs' Exhibit 27 is a spreadsheet which details 3009 files having been accessed after March 13, 2002 on the C drive partition of the Dell Optiplex. (Ashley, 1/7/03 Tr., 118:21–25, 119: 1–25). The list of accessed files included some files which may have been automatically changed merely by turning the machine on and off or executing certain applications of the computer where as others were intentionally accessed. (Ashley, 1/7/03 Tr., 119:23–25, 120: 1–6).

254. Among the files that were accessed was a program called RecoverNT. RecoverNT is a software utility designed to assist in undeletion of files in the NT operating system. (Ashley, 1/7/03 Tr., 120: 10–21).

255. Plaintiffs' Exhibit 28 is a spreadsheet prepared by Ashley showing the date of last modification of files on the C drive partition of the Dell Optiplex. (Ashley, 1/7/03 Tr., 122:1–6).

256. Plaintiffs' Exhibit 29, is a spreadsheet generated by Ashley, which reveals that 348 files were deleted by Bencomo from the C drive partition of the Dell Optiplex between 3/13/02 and the time when it was turned over for examination. (Ashley, 1/7/03 Tr., 124: 23–25–125: 1–8). In Ashley's opinion, Bencomo intentionally deleted the majority of the files listed on Plaintiffs' Exhibit 29. (Ashley, 1/7/03 Tr., 125: 9–24). In Ashley's opinion, some of the Internet history files were selectively deleted by Bencomo while others were left intact, which evidenced deliberate actions by Bencomo to cover his tracks so that anyone examining the computer would not be able to discern what Internet sites he had accessed. (Ashley, 1/7/03 Tr., 127:5–23).

257. Plaintiffs' Exhibit 30 is a spreadsheet created by Ashley from his forensic examination, listing all the files that were created on the C drive partition of the Dell Optiplex computer after March 13, 2002. (Ashley, 1/7/03 Tr., 128:12–17). There were 226 files that were created after March 13th with a total physical size of 4.14 megabytes. (Ashley, 1/7/03 Tr., 129: 3–7).

258. Plaintiffs' Exhibit 31 is a spreadsheet created by Ashley from his forensic examination, listing 645 files that were accessed on the D drive partition of the Dell Optiplex computer after March 13, 2002. (Ashley, 1/7/03 Tr., 130:18–25, 131:1–4).

259. Plaintiffs' Exhibit 32 is a spreadsheet created by Ashley from his forensic examination, listing 645 files that were accessed on the D drive partition of the Dell Optiplex computer after March 13, 2002. (Ashley, 1/7/03 Tr., 133:9–18). One file in particular was a movie file that was 41 megabytes in size, and entitled "Beatles-StrawberryFieldsForever.mpg". (Ashley, 1/7/03 Tr., 19–25). Forty-one megabytes of data represents approximate 5,000 pages of text. (Ashley, 1/7/03 Tr., 134:1–4).

260. Plaintiffs' Exhibit 33 is a spreadsheet created by Ashley from his forensic examination, listing 148 files that were created on the D drive partition of the Dell Optiplex computer after March 13, 2002. (Ashley, 1/7/03 Tr., 133: 9–18). The total size of the 148 files was 525.57 megabytes. (Ashley, 1/7/03 Tr., 135:10–12). Five hundred twenty-five megabytes could easily represent 50,000 printed pages of text. (Ashley, 1/7/03 Tr., 135: 12–16). Bencomo deliberately created these files. (Ashley, 1/7/03 Tr., 135: 17–20).

261. The only possible reason for creating files of that large a size on the day before a computer was scheduled to be turned over for inspection would be to prevent subsequent examination of the space where that data was stored. (Ashley, 1/7/03 Tr., 135:22–25, 136:1–10).

262. This destruction was an intentional act. In doing this, Bencomo knew exactly what he was doing. (Ashley, 1/7/03 Tr., 136: 21–25).

263. Plaintiffs' Exhibit 34 is a spreadsheet created by Ashley from his forensic examination, listing 6 files that were deleted on the D drive partition of the Dell Optiplex computer after March 13, 2002. (Ashley, 1/7/03 Tr., 137:17–25).

264. There was definitely spoliation of evidence by Bencomo and Consorcio. (Ashley, 1/7/03 Tr., 142:14). By accessing the computer and creating and modifying files, as listed in Plaintiffs' Exhibits 27 through 34, it is Ashley's opinion that potential evidence in this case was definitely destroyed. The deletion or recreation of files that were stored on to available space in the computer inevitably would have overridden data which was then no longer accessible. (Ashley, 1/7/03 Tr., 130: 2–7).

265. Consorcio's computer expert conceded that Bencomo "deleted 350 files and wrote over half a gigabyte of data" prior to his computer being turned over for inspection to Four Seasons. (Peña, 1/22/03 Tr., 97: 8–11).

266. The results of Bencomo's deleting this data is that no one will ever know whether his computer contained Four Seasons' confidential information that was not capable of being recovered. (Peña, 1/22/03 Tr., 100: 14 –25,101: 1–2).

267. Ashley also opined that based upon his forensic examination of the Dell Optiplex, Bencomo used that machine to breach Four Seasons' defenses, gain access to the intranet, and bring into the machine electronically the data contained in 38 encrypted e-mail files which Bencomo sent to Lautaro Barrera. (Ashley, 1/7/03 Tr., 143: 3–9). Ashley recovered those files, so this

was the machine used by Bencomo to breach Four Seasons' network. (Ashley, 1/7/03 Tr., 143:10–11).

268. Ashley also undertook an examination of the Dell Optiplex to determine whether Bencomo's allegation that he had not deleted the files but rather had moved them from one partition to another was supported by the evidence. (Ashley, 1/30/03 Tr., 22: 8–12). Based upon Ashley's examination, he found no evidence whatsoever of any transfer or copy/pasting of any files. Rather, he found evidence which was consistent with the initial conclusion that the files had been deleted. (Ashley, 1/30/03 Tr., 22:13–24).

269. Additionally, Bencomo had alleged that he had only deleted files which had been created or existed only after March 13, 2002. However, upon reexamination of the Dell Optiplex, Ashley determined that Bencomo's statement was false, as 126 files of the 347 files that had been deleted had existed on that computer prior to March 13, 2002. (Ashley, 1/30/03 Tr., 23: 7–20; Plaintiffs' Exhibit 53).

270. Bencomo had also alleged that the Dell Optiplex was reformatted before being given back to Consorcio Barr (approximately one week after he was terminated in September 2001). However, Ashley's examination of the Dell Optiplex again revealed that the evidence did not support Bencomo's allegations. Rather, the evidence actually showed that the Dell Optiplex had been reformatted on October 18, 2001, at which time the Dell Optiplex was in the possession of Consorcio. (Ashley, 1/30/03 Tr., 25: 3–25, 26: 1–23; Plaintiffs' Exhibit 56).

### Consorcio's Fabrication of Evidence

271. Bencomo had alleged that Defendant's Exhibit 63 consists of original floppy discs which he had received from Carlos Barrera, Jr. in February 2002. Ashley conducted a forensic examination of those discs and determined that the floppy discs could not possibly have been original discs from February 2002. (Ashley, 1/30/03 Tr., 59: 18–25, 60:1–11).

272. Ashley, as part of his examination of the floppy discs, noted that on the external rear of each disc, there was a serial number. Based upon his experience of more than 13 years, Ashley is aware that removable media like floppies bear markings which identify where and when they were manufactured. Ashley then contacted the manufacturer of the floppy discs, Verbatim, and determined the significance of the serial number. (Ashley, 1/30/03 Tr., 60:12–25).

273. Based upon the examination and breakdown of the serial number, Ashley determined that the floppy disc had been manufactured at the Verbatim factory in Taiwan on the 154th day of 2002, which is June 3, 2002. (Ashley, 1/30/03 Tr., 61:4–22). Thus, his examination of these supposedly original discs only reinforced Ashley's prior opinion that the information was not given to Bencomo on floppy disc, but rather was obtained electronically by Bencomo hacking into the Four Seasons' network. (Ashley, 1/30/03 Tr., 64: 19–25, 65:1).

274. The fact that these floppy discs (Defendant's Exhibit 63) were not the original floppy discs from February 2002 was clearly shown by the fact that they had not even been manufactured as of that date. Consorcio did not contest this finding. (Ashley, 1/30/03 Tr. 86: 20–25, 87: 1–21, 89: 24–25, 90: 1–25, 91: 1–25, 92: 1–2).

275. Thus, it is clear that the floppy discs (Defendant's Exhibit 63) were fabricated.

### Four Seasons' Global Virtual Private Network

276. The Four Seasons global VPN is a communications backbone that Four Sea-

sons uses to permit quick, easy and secure internal communications across the company. (Dunnigan, 1/9/03 Tr. 142: 23–25, 143: 1–3).

277. Four Seasons utilizes a global virtual private network ("VPN") to connect all of the properties of Four Seasons together in one network so that they can communicate. (Henry, 1/10/03 Tr., 7: 14–9, 5: 17–22). For example, the Area Director of Finance for Four Seasons receives at his office in Palm Beach, Florida, financial reports from the Four Seasons Hotel Caracas, transmitted to him over the global VPN. (Dunnigan, 1/9/03 Tr. 143: 4–9).

278. All of the Four Seasons' properties worldwide utilize a VPN device, also called a "firewall and a gateway," from OpenReach, Inc. (Henry, 1/10/03 Tr., 10: 13–15, 23, 12: 10–11).

### OpenReach

279. OpenReach is a company which creates a managed virtual private network service, allowing companies that do not want to invest the large amounts of capital required for network infrastructure to connect diverse geographic locations. OpenReach allows them to do so using the Internet in a secure fashion. (Keenan, 1/8/03 Tr., 76:14–20).

280. OpenReach provides software which it has written, based upon the customer's needs, as well as providing the hardware that will host or run the software. (Keenan, 1/8/03 Tr., 76: 21–25).

281. Four Seasons is a customer of OpenReach. OpenReach has set up Four Seasons' global virtual private network. (Keenan, 1/8/03 Tr., 77: 1–4).

282. As part of the global virtual private network, Four Seasons has installed OpenReach VPN Gateways at its various hotels throughout the world. (Keenan, 1/8/03 Tr., 77: 5–7).

283. The OpenReach gateway, and the software on it, is a security device which is designed to prevent unauthorized access in a variety of dimensions, and to keep track of any attempts at unauthorized access when they occur. (Keenan, 1/8/03 Tr., 77:11–17).

284. Attempts to gain unauthorized access to the VPN and the various networks are maintained in a variety of different logs that are generated automatically by the OpenReach software. These logs are kept on the hard drive of each VPN gateway itself. The software is designed to log this data without any intervention or hands on action from a human being. (Keenan, 1/8/03 Tr., 77: 18–25).

285. The OpenReach VPN Firewall Gateway was installed in the Four Seasons Hotel Caracas in September 2001. (Bolivar, 12/16/02 Tr., 51: 20; Keenan, 1/8/03 77: 8–10). The OpenReach VPN device was located in the communications room of the hotel (separate and apart from the MIS/Systems Office) because that is the only place where Consorcio had installed an Internet connection. (Barrera, 1/21/03 Tr., 108: 20–25; Bolivar 12/18/02 Tr., 65:4–6).

286. One of the principal purposes of the installation of the OpenReach gateways in the various Four Seasons Hotels is to protect the corporate profiles that would be traveling between the central database and the different hotels over the Internet. (Camacho, 1/6/03 Tr., 27: 14–18).

287. The OpenReach VPN Gateway provides access to the global network allowing access to information for all Four Seasons personnel as well as allowing communication between the Four Seasons Hotel Caracas and other Four Seasons Hotels. (Bolivar 12/16/02 Tr., 52: 15–19).

288. Thus, the Four Seasons network in general works as one global network.

All the Four Seasons Hotels are connected and communicate over a WAN or a Wide Area Network made possible by the Open-Reach devices. Over the WAN, doorways are opened up that connect the different servers throughout the world. For example, all the hotels are connected for e-mail purposes through Lotus Notes with a main hub for mail purposes in Toronto. The entire connection is made through the Open Reach VPN Gateway. (Bolivar, 12–16–02 Tr., 54: 1–11).

289. Prior to the installation of the VPN device, Consorcio knew that one of the purposes of the VPN would be to communicate with the central reservations system and Four Seasons' corporate servers. (Barrera, 1/17/03 Tr., 64: 7–10; Defendant's Exhibit 41).

290. The VPN routes traffic within the network based on Internet Protocol ("IP") addresses assigned to each computer. All of Four Seasons' computers are assigned IP addresses beginning with the number "10." (Henry, 1/10/03 Tr., 9: 4–7, 11: 4–7).

291. The Four Seasons' computers located at the hotel in Caracas are part of the VPN, as are the computers located at all Four Seasons' properties. (Henry, 1/10/03 Tr., 14: 24–25, 15: 1–2, 18: 11–14).

292. The purpose of the VPN device from OpenReach is two-fold: to keep traffic from the untrusted Internet out of the network, and to enable all of the internal Four Seasons' computers to be part of the trusted internal network. (Henry, 1/10/03 Tr., 20: 11–14).

293. Consorcio has no legitimate reason to utilize the OpenReach VPN device. (Henry, 1/10/03 Tr., 20: 15–21).

294. Despite repeated requests by Four Seasons, however, Consorcio refused to physically separate its local network from the Four Seasons local network in Caracas, and refused to give Four Seasons'

technical staff access to the communications room of the hotel where the VPN device was located. (Henry, 1/10/03 Tr., 20: 22–25, 21: 1–9).

295. The VPN device was not turned over to Four Seasons until March 2002. (Barrera, 1/21/03 Tr., 111: 23–25). There was no reason for Consorcio not to return the VPN device to Four Seasons, unless Consorcio wanted to utilize it for illicit purposes. (Henry, 1/10/03 Tr., 57: 11–18).

### The OpenReach Logs

296. The Caracas OpenReach VPN gateway maintains logs on a daily basis. (Bolivar 12/17/02 Tr., 48: 16–22).

297. In order to access those logs, Bolivar contacted Four Seasons' corporate offices, who then authorized OpenReach to immediately produce its logs. (Bolivar, 12/17/02 Tr., 48: 23–25, 49: 1–3). At all times, OpenReach registers activity on its log. (Bolivar, 12/17/02 Tr., 49: 4–6).

298. The OpenReach logs from the VPN gateway in Caracas were requested from OpenReach on two occasions, once in October 2001 and the second time in February 2002. (Bolivar, 12/17/02 Tr., 54:7–13, 22–25, 55: 1–2). The request to OpenReach was for an activity report, which would display all the traffic that was going through the OpenReach VPN gateway/firewall. (Bolivar, 12/17/02 Tr. 55:3–6).

299. In October 2001, Dave Keenan of OpenReach was contacted by Bolivar to request that he retrieve log files from the OpenReach VPN gateway at the Caracas location. (Keenan, 1/8/03 Tr., 78: 1–9).

300. After receiving that request, and in keeping with OpenReach procedure, Keenan contacted the authorized contact person within Four Seasons to determine whether or not the request should be satisfied, *i.e.* whether it was authorized by

Four Seasons. In this instance, he contacted Christopher Henry of Four Seasons, who gave authorization to retrieve the logs. (Keenan, 1/8/03 Tr., 78: 10–23).

301. Once Keenan knew that he was authorized to retrieve the log files, he followed OpenReach's standard procedures to access the device in a secure fashion and retrieve the log files. (Keenan, 1/8/03 Tr., 79:1–4).

302. The process to retrieve the logs is highly secure, as it can only be done from a specific location within the Open Reach Network Operations Center located in the northeast of the United States, and it is done over an encrypted, secure data channel. (Keenan, 1/8/03 Tr., 79: 1–16).

303. After connecting to the Caracas gateway over the secure data channel, he retrieved all the relevant log files. Because there is a structure as to how the files and directories are arranged on the OpenReach gateways, he knew precisely what to obtain. (Keenan, 1/8/03 Tr., 79: 17–22).

304. Once Keenan retrieved the appropriate log files, he compressed them using an industry standard tool and e-mailed them to Four Seasons. (Keenan, 1/8/03 Tr., 79:23–25. 80: 1–8).

305. In February 2002, Keenan received a second request to retrieve log files from the Caracas OpenReach VPN gateway, which was in essence the same request that had been made in October the year before. (Keenan, 1/8/03 Tr., 80:9–18). Keenan then followed the same procedure, and after determining that the request was authorized, he retrieved the log files, compressed them and sent them to Four Seasons. (Keenan, 1/8/03 Tr., 80:19–22).

306. During the process of retrieving the log files in October, 2001 and in February 2002, no one at OpenReach did anything to modify, alter or change the log files. (Keenan, 1/8/03 Tr., 80:23–25, 81: 1)

307. The logs received from Open-Reach were not modified by anyone at Four Seasons and were placed on a compact disc. (Bolivar, 12/17/02 Tr., 56:1–15; Plaintiffs' Exhibit 38).

308. Following a certain methodology, Keenan examined the OpenReach logs, which were compiled on Plaintiffs' Exhibit 38, to determine whether or not the data was valid. Based upon his review of the data, Keenan determined that the information on Plaintiffs' Exhibit 38 was the same data that he had retrieved from the log files, and that it appeared to a reasonable certainty to be unaltered and unmodified. (Keenan, 1/8/03 Tr., 82: 1–8).

309. This was confirmed by the fact that OpenReach takes certain precautions to ensure the integrity of the data that the VPN gateway maintains, including that the log data is maintained in a specific format with certain characteristics. Had the data been modified, Keenan would have noted a difference in the formats. (Keenan, 1/8/03 Tr., 82: 9–20).

310. Keenan does not believe that anyone within the Four Seasons organization has the level of understanding of the OpenReach software and the structure of its data logs, sufficient to have been able to modify them in such a way that Keenan would not have noticed. In fact, not even all OpenReach employees have that level of knowledge and understanding. (Keenan, 1/8/03 Tr., 83: 4–22).

311. Keenan undertook all the checks that he thought were necessary to determine whether the data was complete and accurate copies of that certain log data which he had extracted in October 2001 and February 2002. Based upon those validations, it was his opinion that the data was a true and correct copy of the data he extracted from the gateway. (Keenan, 1/8/03 Tr., 99: 14–24).

### *Analysis of the OpenReach Logs*

312. Although computers are assigned a unique IP address, a user can change it in a matter of a few minutes, a practice known as "IP spoofing." (Henry, 1/10/03 Tr., 22: 4–6).

313. Consorcio had everything that was necessary to gain access inside the VPN: physical access to the trusted side of the VPN device, and knowledge of Four Seasons' IP addresses. (Henry, 1/10/03 Tr., 24: 5–25, 25: 1–25, 26: 1–2). Consorcio had knowledge of Four Seasons' IP addresses because it employed Bencomo, a former assistant systems administrator of Four Seasons, who had intimate knowledge of Four Seasons' computer systems and who, as part of his job responsibilities, configured new users on the Four Seasons' network, a process that includes assigning IP addresses. (Henry, 1/10/03 Tr., 25: 19–25, 26: 1–2).

314. Prior to working for Four Seasons, Bencomo worked for Consorcio. Following his termination by Four Seasons, Eduardo Bencomo again worked for Consorcio. (Henry, 1/10/03 Tr., 26: 3–8).

315. The only computers connected to the untrusted interface of the VPN device were Consorcio's computers and those computers connected through the Internet connection. (Henry, 1/10/03 Tr., 26: 9–16; Peña, 1/22/03 Tr., 81: 15–17; Peña, 1/29/03 Tr., 32: 19–22).

316. Log reports generated by the OpenReach VPN device in Caracas in September/October 2001 and February 2002 show rejections of approximately 420,000 transmissions. (Henry, 1/10/03 Tr., 29: 2–12).

317. Approximately 90% of these rejections are shown in the logs to be broadcast packets from Consorcio's computers. (Henry, 1/20/03 Tr., 29: 16–25). This traffic caused congestion on the external interface of the device, which is the side con-nected to the Internet. (Keane, 1/13/03 Tr., 17: 11–22).

318. All rejections shown in the logs are by definition unauthorized transmissions. (Henry, 1/10/03 Tr., 30: 21–24; Keane, 1/13/03 Tr., 11: 15–22). This is because the VPN device is designed to record in its rejection logs only unauthorized traffic. If a packet is approved to traverse the VPN device and travel to a remote computer on the network, the VPN device assumes the packet to be authorized and does not log such activity. (Henry, 1/10/03 Tr., 30: 7–20; Peña, 1/22/03 Tr., 101: 7–25, 102: 1–25; 103: 1–25; 104: 1–25; 105: 1–15, 132: 2–3). This is because the device assumes that approved traffic is within the trusted network, and that physical integrity of the device is not compromised. (Henry, 1/20/03 Tr., 30: 10–13; Peña, 1/22/03 Tr., 107: 1–23). Another reason the device does not record authorized traffic is because such traffic would be too voluminous. (Keane, 1/13/03 Tr., 13: 2–5).

319. Additionally, there are approximately nine thousand (9,000) entries of unauthorized probing traffic in the Open Reach logs from both October 2001 and February 2002. This traffic is significant because it originated from the trusted side of the Open Reach device, which only Four Seasons and Consorcio had access to, and because it was directed to remote Four Seasons' locations throughout the VPN. The logs show unauthorized access attempts by Consorcio purposefully and specifically directed to multiple U.S.-based Four Seasons' computers, including those located in Kona, Hawaii; Austin, Texas, Los Angeles, California; Dallas, Texas; and Las Colinas, California. (Henry, 1/10/03 Tr., 36: 7–25, 37: 1–12; 41: 1–5; 42: 3–12). Many of these attacks were conducted at odd hours of the evening, and the traffic is characterized by successive,

sequential attempts to communicate with remote Four Seasons' locations, occurring as frequently as every three (3) seconds. (Henry, 1/10/03 Tr., 43:4; 52: 10–25, 53: 1–7; 54: 8–25, 55: 1–4; 62: 21–25, 62: 1–24; Plaintiffs' Exhibits 35, 36, 37, 38, 39, 40). Additional hacking attempts were directed at Four Seasons' central reservations system in Toronto, Canada. (Henry, 1/10/03 Tr., 37: 13–19). It is clear that this unauthorized probing traffic was generated by Consorcio. (Henry, 1/20/03 Tr., 46: 20–25, 47: 1–6).

320. In addition to the unauthorized probing, the logs show Consorcio "spoofed" the IP addresses of Four Seasons' computers, which would be expected from someone attempting to hack, and which would be necessary to traverse the VPN device and access remote Four Seasons' systems. (Henry, 1/10/03 Tr., 45: 25, 46: 1–22; 65: 16, 67: 23–25, 68: 1–25; 69: 1–20).

321. IP spoofing occurs when a user changes his IP address to match another person's IP address. It is thus analogous to forgery. (Peña, 1/22/03 Tr., 63: 10–14).

322. IP spoofing would absolutely be expected from someone who intends to engage in computer hacking. (Peña, 1/22/03 Tr., 63: 15–20).

323. If IP spoofing occurs, it renders the spoofed computer unavailable for use. (Peña, 1/22/03 Tr., 65: 12–17).

324. There is no legitimate reason for Consorcio to have spoofed Four Seasons' IP addresses. (Henry, 1/10/03 Tr., 69: 21–23; 97: 11–16).

325. Based on the fact that Four Seasons' IP addresses are not Internet routable, that there were IP addresses broadcasting to the external side of the VPN device, and that the TTL values of the transmissions indicated the transmissions did not come from the Internet, the spoofing traffic from the external, untrusted side of the VPN device had to have originated from Consorcio's computers. (Henry, 1/10/03 Tr., 76: 7–23; 95: 21–25, 96: 1–25, 97: 1–10; Keane, 1/13/03 Tr., 18: 5–:8; Henry, 1/29/03 Tr., 86: 1–25). Four Seasons' computer experts both concluded with certainty that Consorcio spoofed the IP addresses of Four Seasons, based on the evidence shown in the logs reports. (Henry, 1/10/03 Tr., 97: 7–10; Keane, 1/13/03 Tr., 28: 11–25, 29: 1–4; 32: 1–:25; 38: 15–20; 106: 23–25, 107:1–6).

326. It is also noteworthy that Consorcio's network administrator, Bencomo, demonstrated knowledge of IP spoofing by altering the source and destination IP addresses on excerpts of the OpenReach reports he sent out to a list serve on the Internet, wherein he requested information about what the logs showed. (Plaintiffs' Exhibit 26).

327. No unauthorized broadcast traffic would have been generated had the networks been separated, which could have been accomplished in less than thirty minutes. (Keane, 1/13/03 Tr., 19: 9–21, 212: 8–11). Defendants chose not to separate the networks, however, until after the hearing on Four Seasons' motion for contempt of the Preliminary Injunction held in March 2002.

328. No employee of the Plaintiffs has ever initiated a probing attack on the Plaintiffs' own network. Additionally, to do so would be a violation of the Plaintiffs' electronic security policy. (Henry, 1/10/03 Tr., 74: 3–14).

329. Four Seasons' evidence of probing traffic is confirmed by Dr. Jack Keane, Open Reach's Chief Scientist. Dr. Keane testified that the log reports show a pattern of a "systematic" and "exploratory attack" against Four Seasons' remote computers. (Keane, 1/13/03 Tr., 22: 19–25, 23: 1–25, 24: 1–25, 25:1; 29: 7–18). The attack was systematic because it reveals a

sequential pattern of attempting access to Plaintiffs' computers using successive IP addresses. (Keane, 1/13/03 Tr., 29: 9–17). Dr. Keane testified that there is no legitimate explanation for conducting this type of attack, and that he had never seen it before in his review of logs from other OpenReach customers. (Keane, 1/13/03 Tr., 25: 2–9).

330. Dr. Keane confirmed that this pattern of attack traffic was intentional. (Keane, 1/13/03 Tr., 26: 24–25, 27: 1–3).

331. Most significantly, Dr. Keane also confirmed, with certainty, that Consorcio's computers were the source of this attack traffic. (Keane, 1/13/03 Tr., 27: 16–25, 28: 1–2; 34: 24–25, 35: 1–3; 38: 7–14; 38: 24–25, 39: 1–7; 107: 8–13). He considered this attack to be "computer hacking." (Keane, 1/13/03 Tr., 107: 14–16).

332. Dr. Keane further confirmed that Consorcio originated this attack traffic by configuring its computers with Four Seasons' IP addresses. Specifically, Consorcio spoofed Four Seasons' computers. (Keane, 1/13/03 Tr., 28: 11–25, 29: 1–4; 32: 1–:25; 38: 15–20; 106: 23–25, 107: 1–6).

333. If Consorcio had spoofed the right IP address to reach a computer in Four Seasons' remote network, it would have been able to access services through the ports used for the exploratory attack. (Keane, 1/13/03 Tr., 29: 19–:22). If this occurred, however, the log reports would not reflect it. (Keane, 1/13/03 Tr., 12: 24–25, 13:1–2).

334. Moreover, Consorcio's physical access to the VPN device enabled it to see all of the traffic on the Four Seasons network flowing to and from that network to corporate servers and back into other remote sites. That traffic would be easily visible to Consorcio and unencrypted because it is on the trusted side of the network. (Keane, 1/13/03 Tr., 33: 16–25, 34:1–8).

335. Dr. Keane also ruled out Consorcio's argument that Four Seasons may have generated this traffic. (Keane, 1/13/03 Tr., 39: 8–25, 40: 1–8, 80: 10–12, 81: 16–25, 82:1–5, 85: 20–24, 88: 17–18, 101: 2–25, 101: 1–9, 101: 17–25, 102: 1–22).

336. Consorcio's own expert also conceded that the log records were not consistent with the defense theory that Four Seasons generated the probing traffic itself by testing the VPN device. (Peña, 1/29/03 Tr., 42: 9–18).

337. Dr. Keane also stated that the OpenReach VPN device could not have been configured to capture MAC addresses of the unauthorized traffic shown in the logs. (Keane, 1/13/03 Tr., 65: 12–15).

338. Consorcio's expert also conceded that his proffered theory that Consorcio could not have generated the unauthorized traffic shown in the logs because such traffic contained IP identifiers in "big-endian" format and Consorcio's computers were Windows computers that could not possibly generate such formats, was not only concocted during the middle of trial, but was erroneous. (Peña, 1/29/03 Tr., 57: 12–20; 60:18–25, 61: 1; 61:18–25, 62: 1–25, 63: 1–11; 63: 20–24, 68: 16–20). In fact, there are over 30,000 entries in the logs of Consorcio's computers generating traffic in big-endian format. (Henry, 1/30/03 Tr., 87: 1–14; Plaintiffs' Exhibit 55).

339. Consorcio's computer expert testified on direct examination that the format of the packets shown in the logs made it impossible for Consorcio to have generated the hacking traffic. (Peña, 1/22/03 Tr., 56: 19–25, 57: 1–4). However, a week later on cross-examination Consorcio's expert had to concede that his earlier testimony was erroneous. This from the same expert who took the information supplied to him by Eduardo Bencomo at face value, despite

overwhelming evidence to the contrary. (Peña, 1/22/03 Tr., 90:13—90:14).

340. Consorcio concedes that the broadcast traffic beginning with IP addresses starting with the number "5" originated from Consorcio's computers. (Peña, 1/22/03 Tr., 70: 11–4).

341. Consorcio concedes having physical control of the communications room where the OpenReach VPN device was located, and that Consorcio had access to the trusted side of Four Seasons' network. (Peña, 1/22/03 Tr., 80: 24–25, 81: 1–6).

342. Consorcio's computer expert conceded that the parties' networks would have been separated had Consorcio complied with this Court's November 15th, 2001 Preliminary Injunction. (Peña, 1/22/03 Tr., 136:18—137:1).

### Four Seasons was Damaged by Consorcio's Unauthorized Access

343. Four Seasons is positioned at the very top of the lodging sector based upon the high level of service that it provides to its guests, and the premiums it receives for room rates. (Claver, 1/10/03 Tr. 198:17–23).

344. There is an important distinction between a guest profile and a guest history. A guest history is basically the historical information on a specific guest, how many times they have stayed at the property or when. In contrast, a guest profile has more detailed information, which includes name, credit card information, address, funds spent at the hotel and other detailed information. It includes customer's likes, dislikes, complaints, and related information. (Claver, 1/13/03 Tr. 30:24–25, 31: 1–7). This terminology is consistent with the information divided in the Fidelio database for Four Seasons. (Claver, 1/13/03 Tr. 30: 21–24).

345. Premium hotel chains such as Four Seasons or Ritz Carlton do not rely merely on guest histories. Rather, they rely more on the detailed information contained in the customer's profile or guest profile. This is because the profiles contain the detailed information required to market the Hotel chain to that guest and to provide the guest with the highest level of service by knowing what the guest prefers and anticipating the guest's needs. (Claver, 1/13/03 Tr. 31: 8–16).

346. Guest profiles are significant to a hotel especially in the case of Four Seasons because the guest profile is so detailed and contains so much information within it. This allows Four Seasons to provide the highest level of service, which is what Four Seasons is known for, and which gives Four Seasons a competitive edge over other hotels. (Claver, 1/10/03 Tr. 200:6–14).

347. Thus, guest profiles such as the ones utilized by Four Seasons benefits actual hotel operations by allowing the hotel to be able to provide a high level of service which means they retain more guests and guests become more loyal. Four Seasons' guests are therefore, more likely to return and have a positive impact on hotel operations. (Claver, 1/10/03 Tr. 200: 15–18).

348. Guest profiles in the industry are considered to be confidential because they give whoever possesses this type of detailed information on the guest a competitive advantage. Thus, guest profiles enable hotels to more successively sell their services and to better serve their clients. (Claver, 1/10/03 Tr. 200: 21–25, 201: 1–4).

349. Utilizing a formula to estimate the potential revenues that the Fidelio database and guest profiles could produce for a hotel, Price Waterhouse Coopers was able to arrive at evaluation for the guest profiles of the Caracas Hotel. (Claver, 1/10/03 Tr. 201: 5–13). By utilizing a formula which takes the number of profiles multiplied by the average amount of money

spent per day by a guest at that hotel times the average length of stay at the hotel, multiplied by a repeat factor, Price Waterhouse Coopers was able to determine the value of the profiles. (Claver, 1/10/03 Tr. 201: 16–18).

350. For the Four Season Hotel Caracas, multiplying 11,000 records by an average daily spend of $380.00 U.S., times an average length of stay of two nights, and using a repeat factor of 25% for Four Seasons Hotels, the value of the Fidelio database of Caracas is $2,090,000.00. (Claver, 1/10/03 Tr. 201:19–25, 202: 1–25, 203: 1–25, 204: 1–5).

351. The rates which Price Waterhouse Cooper used to compute the value of the Fidelio database for the Four Seasons Hotel Caracas were based upon evidence and testimony at the trial, and industry standards for this type of hotel. (Claver, 1/10/03 Tr. 203: 4–5, 21–22).

352. The methodology used to compute the intrinsic value of the Caracas guest list is an accepted methodology, and it was a precise formula, using an income approach to value in the list, by showing the potential income which would be derived from having access to that database. (Claver, 1/13/03 Tr. 31: 17–15, 32: 1–3.)

353. In contrast, the value of the Four Seasons Worldwide global database, would not be a function of the revenue generated to a particular hotel but rather would be computed based on a percentage value for the intellectual property to the company, multiplied by its market capitalization. (Claver, 1/10/03 Tr. 204: 10–25).

354. Four Seasons' market capitalization based upon information contained in their annual report and their share price, is 1.95 billion dollars. (Claver, 1/10/03 Tr. 205: 1–6). The rates of percentage to be applied for the value of intellectual property of the company for this type of list is between 1% and 5%. (Claver, 1/10/03 Tr. 205: 7–9). This percentage is based on

industry standards, and therefore, because of Four Seasons' position at the top end of the range within the lodging industry, the valuation ratio would also be at the top end of the range, between 4% and 5%.(Claver, 1/10/03 Tr. 205: 10–15). Based on that percentage, Four Seasons' global customer database is valued between $78 million and $97.5 million. (Claver, 1/10/03 Tr. 205: 16–21).

### *Four Seasons' Corporate Customers in Fidelio*

355. The target market for the Four Seasons Hotel in Caracas would be a corporate market, and a large portion of that business would come from the United States. (Claver 1/13/03 Tr. 3: 15–18). This was corroborated by the actual data contained in the Fidelio database, which revealed that approximately 4,500 of the 11,000 profiles in the database were generated from the United States. In fact, of that number approximately 1,000 came from the State of Florida specifically. (Claver, 1/13/03 Tr. 3: 19–25).

356. Hotel operators such as Four Seasons maintain established corporate relationships. (Claver, 1/13/03 Tr. 4: 1–3). These corporate relationships are a way of generating future business. The corporate segment represents a huge revenue generator for hotels and the corporate relationships are a way of generating repeat business for the brand. (Claver, 1/13/03 Tr. 4:4–7). Based upon review of the Fidelio database, Four Seasons has established corporate account relationships. (Claver, 1/13/03 Tr. 4: 8–10; Ferraro, 1/8/03 Tr., 60:24—61:6; Henry, 1/10/03 Tr., 82:16—83:5).

357. A review of the Fidelio database showed that the corporate accounts whose personnel stayed at the Caracas hotel were of a very high caliber, including top companies in the United States such as AT & T,

Bank of America, Booz Allen, Coca–Cola, Hewlett Packard, IBM, Lucent Technology, Merrill Lynch, Morgan Stanley, Pepsi, and AOL Time Warner. (Claver, 1/13/03 Tr. 4: 11–14, 5: 3–15). Additionally, a report from the Fidelio database shows that these corporate contacts generated a significant amount of the room nights at the Four Seasons Hotel in Caracas and were also budgeted to represent a significant portion of that business in 2002. (Claver, 1/13/03 Tr. 5: 3–7).

358. Therefore, if an owner of a particular hotel, such as Consorcio, was thinking of changing operators, the impact of having the Fidelio database would be significant as a new operator would then have a head start. They would have a list of profiles of people who have already stayed at the Caracas Hotel and that would reduce the "ramp up" time that the new operator would need to stabilize the property. (Claver, 1/13/03 Tr. 5: 16–22).

359. Consorcio admitted that it had spoken to Ritz Carlton and Hotels Hesperia and other hotel companies as well. (Claver, 1/13/03 Tr. 5: 23–25, 6: 1–2).

360. When a hotel owner seeks to switch operators, it is not unusual for the prospective new operator to either put in capital improvements if the hotel is unfinished, requires updating or capital improvements, or alternatively, for a new operator to put some equity into the property in exchange for a long-term management contract. (Claver, 1/13/03 Tr. 6: 5–13). In exchange for such a long term commitment from an owner like Consorcio, a hotel operating chain could make a financial contribution to Consorcio which could run into the millions. (Claver, 1/13/03 Tr. 6: 14–21).

361. Additionally, given the fact that the industry standard repeat factor for corporate hotels in a city is between 25% to 30%, if the hotel owner had access to a prior operator's customer list, that list would greatly benefit future operations of the hotel. Thus, the value of that benefit would be the value of the database, or $2,090,000.00. (Claver, 1/13/03 Tr. 6: 22–25, 7: 1–9).

### Four Seasons Incurred Expenses

362. Four Seasons expended approximately $28,000.00, for the cost of investigating, separating the computer networks and attempting to prevent interception of the Four Seasons' computer data by Consorcio. (Dunnigan, 1/10/03 Tr. 4: 21–23, 5: 1–5).

### Background Reputation Facts

363. Consorcio concedes that the mark "Four Seasons" is world-famous. (Barrera, 1/21/03 Tr., 59: 3–6).

364. Consorcio's vice-president is familiar with Four Seasons Hotels having stayed at many. (Barrera, 1/21/03 Tr., 61:22).

365. There is an obvious connection between the Caracas hotel and the Four Seasons' chain of hotels because the Caracas hotel was known as a "Four Seasons" hotel and because the rooms in the Caracas hotel contained a directory listing of all Four Seasons' hotels and resorts worldwide. (Barrera, 1/21/03 Tr., 63: 21–23; 61: 24–25, 62: 1–2).

366. Consorcio concedes trading on Four Seasons' name to market the residential apartments. (Barrera, 1/21/03 Tr., 64: 18–20).

367. Four Seasons is the holder of seven registered trademarks issued by the United States Patent and Trademark Office. They are Registration Nos. 1,195,-412; 2,349,239; 1,687,336; 2,127,969; 1,722,696; 2,296,226; 1,156,739. Each of these registrations relates to the word mark "Four Seasons" and/or the "tree logo" used by the Four Seasons. (Ferra-

ro, 1/8/03 Tr., 62: 7–25, 63: 1–25, 64: 1–25, 65: 1–25, 66: 1–25, 67: 1–313; Plaintiffs' Exhibits 6 and 57). Four Seasons continues to use each of the trademarks contained in these registrations for the goods and services reflected in the registrations. (Ferraro, 1/8/03 Tr., 68: 4–8).

368. Consorcio's marketing materials for the residential apartments utilize Four Seasons word mark and tree logo. (Exhibit 80; Ferraro, 1/9/03 Tr., 23: 9–24). The materials, however, are not an authorized use of those marks. (Ferraro, 1/9/03 Tr., 23: 25, 24: 1–5).

369. The materials were not approved pursuant to the elaborate procedures Four Seasons has established for marketing collateral approval. (Ferraro, 1/9/03 Tr., 24: 7–25, 25: 1–25, 26: 1–8).

370. In non-compliance with Four Seasons' standards and policies, the Consorcio marketing materials do not use the proper paper weight, paper stock, font, or type. They use the term "Suites" instead of the approved term "Residences," fail to use the R-in-a-circle designation for a registered mark, fail to use approved photography, and generally appear unprofessional, especially when compared to materials that have been prepared in accordance with Four Seasons' standards and procedures. (Ferraro, 1/9/03 Tr., 26: 13–25, 27: 1–25, 28: 1–28, 29: 1–18).

371. The marketing materials used by Consorcio have a negative effect on prospective customers because they fail to live up to the high quality expected of a Four Seasons' product. (Ferraro, 1/9/03 Tr., 30: 13–25).

372. The marketing materials fail to conform to Section 5.02 of the License Agreement because they are in bad taste and/or inconsistent with Four Seasons' public image. (Ferraro, 1/9/03 Tr., 31: 4–25, 32: 1–5).

373. Consorcio's marketing materials do not contain insets or a sufficient number of photographs. The materials are also void of information regarding either the hotel's services and facilities or the community, such as schools and churches. (Ferraro, 1/9/03 Tr., 130: 16–25, 131: 1–25, 132: 1–23).

374. Consorcio's marketing materials were disparaging to Four Seasons because "your company is judged on what people see." (Ferraro, 1/9/03 Tr., 104: 25, 105: 1–3). The marketing materials were also inconsistent with Four Seasons' brand image. (Ferraro, 1/9/03 Tr., 133: 16–18).

375. Four Seasons trademark is used on a sign on Consorcio's property located on the busiest street corner in Caracas and highly visible to the public. (Plaintiffs' Exhibit 7; Ferraro, 1/9/03 Tr., 32: 10–25, 33: 1–4).

376. Four Seasons is not affiliated with Banco Mercantile, and the use of Four Seasons' trademark on the sign is not authorized by Four Seasons. (Ferraro, 1/9/03 Tr., 33: 7–18).

377. The use of the Four Seasons' trademark on the sign is confusing and misleading to the public. (Ferraro, 1/9/03 Tr., 34: 4–14).

378. An American traveler to Caracas would be confused or misled by the unauthorized use of Four Seasons' trademark on the sign, and if he or she had a negative experience with the bank's services, it would negatively impact on Four Seasons' reputation with that U.S. customer. (Ferraro, 1/9/03 Tr., 34: 15–25, 35: 1–10).

379. Consorcio has not taken action to protect the Four Seasons' trademark from being used without authorization on the exterior of its building, despite receiving a complaint about that sign from Four Seasons. (Ferraro, 1/9/03 Tr., 36: 11–25).

380. Consorcio did not comply with Section 5.03 of the License Agreement because it did not advise or otherwise bring to Four Seasons' attention that the Four Seasons trademark was being used on Banco Mercantil's sign on the exterior of Consorico's building. (Ferraro, 1/9/03 Tr., 38: 9–18).

381. The Four Seasons trademark was, at the time of trial, on the bank sign of the exterior of Consorcio's building. (Barrera, 1/21/03 Tr., 124: 11–14).

### Consorcio's Non–Compliance with the License Agreement

382. Consorcio has a License Agreement with Four Seasons, which is the vehicle that entitles Four Seasons to collect royalty fees. (Dunnigan, 1/9/03 Tr. 147: 3–8). The basic components of the License Agreement is payment of one-half of one percent of gross operating receipts for the hotel, two percent of the sales value of the condominium apartment units, and ten percent of excess sales proceeds from the condominium apartments (except for certain units which were excluded by contract). (Dunnigan, 1/9/03 Tr. 147: 12–25).

383. Consorcio has not paid any of the royalties due under the License Agreement. (Ferraro, 1/9/03 Tr., 40: 14–25, 41: 1–4; Dunnigan, 1/9/03 Tr. 148: 4–8).

384. Four Seasons computes monthly the amount of royalties that are due to it under the License Agreement. (Dunnigan, 1/9/03 Tr. 148: 9–13).

385. The royalty fee due on the gross proceeds from the hotel operations is $66,800.00. (Dunnigan, 1/9/03 Tr. 148: 14–19).

386. The amount due for the residential unit sales is estimated at $268,000.00. It is only an estimate because it was done based upon the only information available to Four Seasons. (Dunnigan, 1/9/03 Tr. 148: 19–23). Four Seasons does not have the information necessary to make a proper calculation because despite demand, Consorcio Barr has refused to provide it. (Dunnigan, 1/9/03 Tr. 149: 3–7).

387. The estimated calculation is Four Seasons' best estimate as of mid–2001, which was the last time they received even general information as to which units had been sold and what proceeds were due as of that point and time. If any additional condominium units—even one more unit—has been sold since mid–2001, then more royalties are due. Any changes to the estimated number would be an increase in the royalty due to Four Seasons. (Dunnigan, 1/9/03 Tr. 149: 9–14).

### Consorcio's Failure to Follow Four Seasons' Quality Standards

388. The License Agreement also provides that "Owner shall not take any action that may preclude the Hotel from being operated in accordance with Licensor's policies and procedures." (Agreement § 5.05, Plaintiffs' Exhibit 1).

389. Four Seasons has the exclusive authority to operate the hotel on a day-to-day basis in accordance with the parties' agreements, and in accordance with Four Seasons' policies and procedures. (Giacometti, 1/7/03 Tr., 38: 8–15, Plaintiffs' Exhibit 2). Consorcio, however, did not allow Four Seasons to follow these policies and procedures or otherwise abide by the agreements, as it was constantly interfering with operations.

390. Consorcio did not comply with Section 5.05 of the License Agreement, which prohibits Consorcio from taking any action that would preclude Four Seasons from operating the hotel in accordance with its policies and procedures, because Consorcio failed to follow the standards of Four Seasons in so many areas. (Ferraro, 1/9/03 Tr., 39: 1–14).

391. Consorcio did not comply with Four Seasons' quality control standards and policies regarding the physical plant of the hotel as well as regarding furniture, fixtures and equipment. Four Seasons provided Consorcio with specific written notice of these substantial and extensive deficiencies. (Lind, 1/6/03 Tr., 39: 25, 40:1–6, 41: 15–25, 42: 1–2).

392. Consorcio also failed to comply with Four Seasons' quality control standards and policies regarding life and fire safety systems. Four Seasons provided Consorcio with specific written notice of these substantial and extensive deficiencies. (Lind, 1/6/03 Tr., 39: 25, 40: 1–6).

393. These deficiencies included, by way of example, a lack of smoke detectors and sprinklers in public areas, including meeting rooms, a lack of push bar hardware on evacuation doors, a lack of evacuation signage, a lack of any communications ability within elevator cabs, a lack of markers in the pool and Jacuzzi areas, and significant problems with air distribution and air conditioning systems. (Lind, 1/6/03 Tr., 40: 22–25 41: 1–24). The outside of the building was not completed, construction was ongoing in the tower, planters were left with gaping holes and no plants, the lighting was not functional, computer systems were missing, there was no banquet equipment, valet could not function, there was only one coffee machine in the entire hotel. (Ferraro, 1/8/03 Tr., 40: 3–11). The hotel was in fact never finished, and contained substantial deficiencies warranting the issuance of a document of substantial incompletion, which Consorcio disregarded. (Ferraro, 1/8/03 Tr., 38: 16–9; 39: 3–5; 40: 1–2).

394. Additionally, Consorcio denied Four Seasons any access to the fire control security center of the hotel, in contravention of Four Seasons' standards and policies. (Lind, 1/6/03 Tr., 42: 13–25, 43: 1–25).

395. Furthermore, the engineering department of the hotel was provided with virtually no equipment. (Lind, 1/6/03 Tr., 68: 2–12). It was missing, for example, hammers. (Ferraro, 1/9/03 Tr., 19: 24–25, 20: 1–25, 21: 1–21).

396. Although Four Seasons provided specific written notice of these deficiencies to Consorcio, these deficiencies were ignored by Consorcio. (Lind, 1/6/03 Tr., 42: 9).

397. Deficiencies related to the furniture, fixture and equipment were also extensive, and included, by way of example, a complete lack of Four Seasons signage on the exterior of the hotel, a complete lack of artwork anywhere in the hotel, a significant lack of furniture in the public areas and in the meeting and banquet rooms. The furniture that was provided was of poor quality, and non-commercial grade. There were also significant shortages of supplies in the hotel kitchen. The business center of the hotel was incomplete. There was also a lack of furniture and communications equipment in the administrative offices of the hotel. One of the hotel's restaurants was incomplete, the entire spa operation was not open, and there was construction adjacent to the swimming pool. The entire top two floors of the hotel, which were supposed to house the VIP suites and well as other large suites for groups, were not finished. (Lind, 1/6/03 Tr., 45: 9–25, 46: 1–22; 176: 23–25, 177:1–3). There were no linens or skirting, rendering Four Seasons unable to operate any banquet events. (Lind, 1/6/03 Tr., 135: 18–20). The pool and Jacuzzi were not heated properly, water temperature problems caused by inadequate electrical systems prevented laundry from being washed properly, and there was no air conditioning in the meeting rooms. (Lind, 1/6/03 Tr., 178: 6–24).

398. Consorcio's deficiencies in providing furniture, fixtures and equipment were in violation of Four Seasons' quality control standards and policies. (Lind, 1/6/03 Tr., 46: 23–25, 47:1–5); (Ferraro, 1/8/03 Tr., 41: 2–4).

399. Four Seasons provided Consorcio with specific notice that these deficiencies violated Four Seasons' standards and policies, however, Consorcio ignored this and failed to resolve the problems. (Lind, 1/6/03 Tr., 47: 6–14, 51: 10–18).

400. Consorcio's deficiencies in the physical plant of the hotel and with respect to furniture, fixtures and equipment had an adverse impact on Four Seasons. The hotel did not present a Four Seasons product physically, and this undermined Four Seasons' ability to secure business from groups that would not commit to booking a stay if the hotel was incomplete. (Lind, 1/6/03 Tr., 47: 15–20).

401. Additionally, Consorcio's failure to comply with Four Seasons' quality control standards significantly marred the reputation of Four Seasons as a company, as guest expectations were not met as they entered the hotel due to the problems described above. These failures by Consorcio led to guest complaints, including complaints from American guests. (Lind, 1/6/03 Tr., 47: 22–25, 48: 1–8; 72: 25, 73: 1–25, 74: 1–11).

402. Another extreme violation of Four Seasons' standards and policies was Consorcio's employ of armed security guards, something which was completely unbecoming of a Four Seasons hotel. This damaged Four Seasons' reputation with guests as guests associated any staff member at the hotel with Four Seasons. (Lind, 1/6/03 Tr., 48: 16–21). These security guards were first equipped by Consorcio with sidearms, which later were exchanged for shotguns. (Lind, 1/6/03 Tr., 51: 4–:8). Four Seasons specifically complained that this situation was in violation of Four Seasons' standards and policies, but Consorcio ignored those complaints. (Lind, 1/6/03 Tr., 50: 4–12, 22–25 51: 1–3). This situation made guests of the hotel, including American guests, "very nervous," and it detracted from the "Four Seasons experience" and harmed Four Seasons' reputation. (Lind, 1/6/03 Tr., 73: 13–25, 74:1–11).

403. Consorcio also violated the Four Seasons' standards and policies by exclusively controlling and denying Four Seasons access to the communications room of the hotel containing computers and communication equipment necessary for the proper operation of the hotel by Four Seasons. (Ferraro, 1/8/03 Tr., 111:16—111:20). This led to, among other things, the inability of Four Seasons to respond to guest inquiries. (Lind, 1/6/03 Tr., 51: 19–25, 52: 1–25, 53:1–3).

404. Four Seasons rights of full control over the hotel provided under Section 5.01 of the Management Agreement are necessary to ensure that the hotel conforms and maintains in the marketplace its presence as a Four Seasons licensed hotel dispensing services to Four Seasons guests that Four Seasons has brought to Caracas. (Ferraro, 1/8/03 Tr., 106: 2–7).

405. The purpose of Section 4.01 of the License Agreement, regarding quality control, is to allow Four Seasons to maintain quality adherence as a global company for all of its hotels globally. (Ferraro, 1/9/03 Tr., 16: 17–25, 17:1).

406. Consorcio did not comply with Section 4.02 of the License Agreement. That provision required cooperation with Four Seasons to ensure that the hotel met the high standards and quality characteristics of the hotels and resorts managed or operated by Four Seasons. (Ferraro, 1/9/03 Tr., 17: 24–25, 18: 1–9).

407. Consorcio further violated the quality control standards of Four Seasons by disseminating marketing materials for the residential apartments of the hotel. These materials utilized the Four Seasons trademarks, including the Four Seasons word mark and tree design logo. (Plaintiffs' Exhibit 7, Defendant's Exhibit 80).

408. Consorcio was required to seek Four Seasons' approval regarding the appearance of marketing materials that should carry the Four Seasons name, logos or trademarks. (Giacometti, 1/7/03 Tr., 41:23–25, 42:1–2). Giacometti had an opportunity to see marketing materials which had been prepared by Consorcio concerning the sale of the condominium units. (Giacometti, 1/7/03 Tr., 42: 3–6, Plaintiff's Exhibit 7).

409. Four Seasons complained to Consorcio on multiple occasions that the condominium marketing materials were inconsistent with the high quality materials required by Four Seasons. (Lind, 1/6/03 Tr., 53: 3–14, 54: 20–23, 56: 16–25, 57: 8–12).

410. Consorcio, however, ignored these complaints about the marketing materials and never corrected the deficiencies. (Lind, 55: 24–25, 56:1–5, 57: 13–15).

411. Additionally, Four Seasons did not approve these marketing materials. (Lind, 1/6/03 Tr., 53: 15–18; Gomez, 1/30/03 Tr., 6: 22–25, 7:1–3).

412. Four Seasons had global standards for marketing materials used in the sale of condominium units of their past hotel projects. The marketing materials that Consorcio prepared were not suitable for Four Seasons and did not comply with the Four Seasons standards for materials of that type. (Lind, 1/6/03 Tr., 53: 21–25, 54: 1–15; 57: 5–7; Giacometti, 1/7/03 Tr., 43: 14–24).

413. Typical marketing material packages for condominium units that meet Four Seasons standards include not only the description of the product, but also the environment where the product is going to be located, the school systems and different activities to which the owner of the condominium has access not only within the project but also within the city. The materials were also presented differently. Four Seasons pictures are taken differently—they are professionally taken, colors are well identified. There is a CD-rom included which allows the potential owner to actually go through the residence instead of just looking at it on paper. It is a very thorough and detailed package that promotes the concept and is printed on bonded paper with a very high quality glossy appearance. There is also a standardized format as far as printing is concerned and it generally promotes the entire Four Seasons concept. (Giacometti, 1/7/03 Tr., 44: 1–7 11–25, 45: 1–7).

414. In contrast, Consorcio utilized a two-folder brochure. (Giacometti, 1/7/03 45: 8–10, Plaintiffs' Exhibit 7, Defendants' Exhibit 80).

415. Four Seasons enjoys a very stable, well established reputation worldwide in the hotel industry and in the condominium or residence community. (Giacometti, 1/7/3 Tr. 45:11–15.) This reputation is incredibly important to Four Seasons because it is a main selling tool which Four Seasons utilizes to promote selling residences in the different countries. As a result, Four Seasons is interested in maintaining, even in the sale of condominium residences attached to hotel projects, the highest possible standards. (Giacometti, 1/7/03 Tr., 45: 16–22).

416. The materials used by Consorcio (Plaintiffs' Exhibit 7) did not meet those standards in any way. (Giacometti, 1/7/03 Tr., 45: 23–24). The marketing materials that Consorcio utilized did not place Four Seasons in the best possible light with

respect to possible prospective purchasers of condominiums, and in fact are not presented in a way that anyone would expect Four Seasons to promote itself especially in a new destination such as Caracas. (Giacometti, 1/7/03 Tr., 45: 25, 46: 1–5). If a guest of the Four Seasons in Caracas was interested in potentially acquiring a condominium in Caracas, they would see the materials that were prepared by Consorcio (Plaintiffs' Exhibit 7), rather than a marketing package that met with Four Seasons standards. (Giacometti, 1/7/03 Tr., 47: 10–17).

417. The marketing materials used by Consorcio were of low quality, inconsistent with the high quality used at other Four Seasons' properties, and improperly used the term "Suites" instead of the term "Residences" used at the other Four Seasons' hotels. (Lind, 1/6/03 Tr., 54: 1–25, 55: 1–19, 57: 1–7, 69: 1–10, 69: 18–25, 70: 23–25, 71: 1–25, 72: 1–20).

418. Banco Mercantile occupies space within the hotel structure. On the exterior of the bank, there is a sign that contains the trademark "Four Seasons," directly underneath the name of the bank. (Lind, 1/6/03 Tr., 57: 16–21; 58:2–3).

419. The use of the trademark "Four Seasons" on the bank sign on the exterior of Consorcio's building is not authorized by Four Seasons. (Lind, 1/6/03 Tr., 57: 24–25, 58:1).

420. Four Seasons complained to Consorcio about the use of the Four Seasons mark on the sign, including a complaint in writing. (Lind, 1/6/03 Tr., 58: 12–15; 137:20). Consorcio, however, took no action to have the Four Seasons mark removed from the sign on the exterior of its building used by the bank. (Lind, 1/6/03 Tr., 58: 16–22; 103: 13–23).

### Consorcio's Interference with Financial Operations

421. The purpose of Dunnigan's first trip in October 2000 was to assess what actions needed to be taken and what had to be put in place to get the hotel functioning from a finance prospective. (Dunnigan, 1/9/03 Tr. 143: 19–21). His determination was that there were substantial obstacles. First and foremost, the Finance Department within the Hotel had tremendous challenges placed upon them because they did not have adequate control over the hotel banking arrangements which precluded them from doing an effective job. (Dunnigan, 1/9/03 Tr. 143: 22–25, 144: 1–4).

422. The decision to impose this financial system upon the Four Seasons Hotel Caracas was made by Consorcio. (Dunnigan, 1/9/03 Tr. 153: 21–24). This system and these procedures were not at all consistent with Four Seasons standard practice and policies. (Dunnigan, 1/9/03 Tr. 153: 25, 154: 1–2). This was addressed repeatedly with Consorcio, and Consorcio chose not to respond. Instead, Consorcio's attitude was "that's the way it is." (Dunnigan, 1/9/03 Tr. 154: 10–12).

423. Consorcio's insistence that it control all the banking aspects and purchasing hindered the Hotel finance staff and their ability to manage on a number of levels. It made it impossible for the hotel to ensure that products were getting in and received and paid for on time, and second, it made for an extremely complex and cumbersome arrangement thereby making it very difficult for the Finance Department to maintain controls. (Dunnigan, 1/9/03 Tr. 144: 5–17).

424. The process which Consorcio required for getting payments approved and ultimately getting payments to the vendor, creditor, employee or service provider was arbitrary. (Dunnigan, 1/9/03 Tr. 145:23–

25). Four Seasons would submit a stack of invoices to Consorcio reflecting routine purchases and out of those some would be paid and some would not. Seemingly to Four Seasons, all of the invoices should have been paid. (Dunnigan, 1/9/03 Tr. 146: 1–4). This problem was an on-going situation and was repeatedly raised with Consorcio. (Dunnigan, 1/9/03 Tr. 146: 5–6). In fact, Dunnigan personally communicated this problem to Lautaro Barrera in October 2000. At that time, during a meeting Barrera asked Dunnigan what the priorities ought to be from a financial perspective to get the hotel opened. Dunnigan responded that the "number 1" priority was to get the banking established and to get the hotel bank accounts set up and running. (Dunnigan, 1/9/03 Tr. 146: 17–22). Consorcio did not follow the advice at that time. (Dunnigan, 1/9/03 Tr. 146: 23–24).

425. It was an uphill battle trying to get information concerning bank statements and details of what deposits and withdrawals and other activities were occurring in the hotel bank accounts from Consorcio. (Dunnigan, 1/9/03 Tr. 150: 23–25, 151: 1–3). Four Seasons' financial personnel were constantly chasing after Consorcio's accounts to try to compile information for the financial reports. (Dunnigan, 1/9/03 Tr. 150: 18–25).

426. The hotel bank accounts were finally opened in March 2001, almost two months after the hotel opened for business. (Dunnigan, 1/9/03 Tr. 151:4–8).

427. When the hotel bank accounts were finally opened, Four Seasons thought that they had cleared those hurdles and would be able to get on with business as usual. Four Seasons had bank accounts with signature cards and bank account numbers. However, unbeknownst to Four Seasons, Consorcio had made arrangements with the bank to re-deposit any incoming depository activities from that account into separate accounts that were accessible only to Consorcio. As a result, Four Seasons ended up with bank accounts for which they had no money, no checks, and to which no deposits were going into. Four Seasons was thus left again in the situation where it had a checkbook, but it did not have any money. (Dunnigan, 1/9/03 Tr. 151:12–23).

428. This had a significant negative effect on the finance department on a number of fronts. First, Four Seasons would have to routinely go to Consorcio to request funding for day-to-day banking transactions. These requests would sometimes be approved by Consorcio and sometimes not. The bigger problem from an operational perspective was that the hotel lacked adequate working capital. Consorcio deprived Four Seasons of the resources to run the business day-to-day. This made it very difficult from a "managing the business" point of view, because Four Seasons faced huge challenges in getting products in the door so as to be able to provide basic services. (Dunnigan, 1/9/03 Tr. 151: 24–25, 152: 1–10).

429. From an accounting perspective, it was even more difficult because the situation created difficult bookkeeping which needed to be done by the hotel accounting staff. The hotel accounting staff would process what they thought were the hotel's operations in terms of cash receipts, credit card vouchers etc., and would do the appropriate paper work. However, because the funds were never going into any bank accounts that Four Seasons could see, the hotel staff was then required to chase down banking activity which only Consorcio had access to or knowledge of. This required that the Four Seasons' accounting staff request the bank account statements from Consorcio because they were not always provided. Even when Consorcio did provide those statements, it did not

do so on a timely basis. The hotel accounting staff thus did not know what was happening from a cash flow perspective because they were not privy to that important information. (Dunnigan, 1/9/03 Tr. 152:11–25, 153: 1–17).

430. Four Seasons tried to do everything possible to make sense of this complex process, including bringing down additional staff from all over Four Seasons' organization. Four Seasons brought in an accountant whose sole function was to try to keep track of the credit card accounting, and Dunnigan even sent down his own staff from the Four Seasons Palm Beach to Caracas on two separate occasions to try to make sense of the cumbersome credit card accounting that was being caused by Consorcio. (Dunnigan, 1/9/03 Tr. 154: 2–25. 155: 1–5).

431. Consorcio directed and controlled the bank accounts, made deposits and withdrawals, and transferred funds in and out of the accounts without Four Seasons' knowledge. The operating proceeds from the hotel also went into these accounts, but Four Seasons could not see those either. Disbursements were being made, but they had to be approved separately and Four Seasons did not always get information from Consorcio regarding those approvals. (Dunnigan, 1/9/03 Tr. 155: 6–16).

432. Additionally, Consorcio diverted hotel revenues for its own purposes (contrary to the terms of the Hotel Management Agreement). As of December 1, 2001, Consorcio had diverted money from the operational proceeds of the hotel to its own accounts, to the tune of approximately $1,000,000.00 U.S. (Dunnigan, 1/10/03 Tr. 5: 8–21).

433. An additional impediment to stabilizing the financial processes of the hotel was that Consorcio would not approve the budget and there was an ongoing debate between Consorcio and Four Seasons about the operating budget of the hotel. (Dunnigan, 1/9/03 Tr. 156: 6–9).

434. Nonetheless, Four Seasons sought out Consorcio's financial advisor, Roger Pelayo, to establish a workable dialog in an effort to get information about transactions and bank account activity. (Dunnigan, 1/9/03 Tr. 157: 5–13). However, Consorcio continued to interfere in the financial operation of the hotel by constantly providing interrogatories and questions of even the minutest details of absolutely routine day to day transactions. For example, the finance department would get memo after memo questioning why an individual guest had received the 37 cent discount posted against a telephone call the prior day. (Dunnigan, 1/9/03 Tr. 158: 1–7).

435. Because of the lack of normal financial operations caused by Consorcio's arbitrariness, for the months of January through April 2001, Four Seasons was not in a position where it believed that any financial statements which were prepared would be accurate. Thus, utilizing the additional staff which they brought from other properties, Four Seasons worked to try to resolve as many of the difficulties as possible, and ultimately produced the first financial statements for the Caracas Hotel on May 18, 2001, which covered the period of January through April 2001. (Dunnigan, 1/9/03 Tr. 156:12–22). Four Seasons generated these statements with the knowledge that there were still issues that needed to be addressed and that the statements would need to be fine tuned over the next few months. (Dunnigan, 1/9/03 Tr. 156: 22–25, 157: 1–2).

436. From May 2001 forward, Four Seasons continued to render monthly profit and loss statements. (Dunnigan, 1/9/03 Tr. 157: 3–5).

437. For most of this period of time, Four Seasons, in addition to providing

profit and loss statements which was what they were required to do under the contract, Four Seasons also provided the owner with daily revenue sheets. (Dunnigan, 1/10/03 Tr. 9: 9–14). The daily revenue reports provided a quick snapshot summarizing the business activities each day for operations on the prior day. It indicated gross revenues received for the day as well as month to date revenue received, comparisons to budget, and comparisons to the same time last year if it were an ongoing hotel. The reports also included some statistical information and a summary explaining, for example, how many people dined in the various restaurants. (Dunnigan, 1/10/03 Tr. 10: 2–10). The daily revenue report provided the gross receipts of the hotel on a daily basis. (Dunnigan, 1/10/03 Tr. 10:14–16). Using the daily gross revenues, one can calculate on a daily basis the amount of royalties that would be due to Four Seasons under the License Agreement. (Dunnigan, 1/10/03 Tr. 10: 18–22).

438. Consorcio was also hypercritical of even the most minute expenditures. Such questioning over the expenses is not in accordance with the normal way in which an opening occurred within the Four Seasons and the ownership of one of its hotels. (Giacometti, 1/7/03 Tr., 39: 14–20). Consorcio questioned minor expenses that were normal for a pre-opening process. (Giacometti, 1/7/03 Tr., 20: 4–9).

439. Based upon Giacometti's observations of Consorcio and discussions with Consorcio's management, the major motivating factor for Consorcio's continual questioning of expenditures was Consorcio's lack of funds. (Giacometti, 1/7/3 Tr., 40: 1–5).

440. In fact, Consorcio's loan on the hotel property is in default. (Barrera, 1/21/03 Tr., 41:1—41:2; 42:1—42:11).

441. Consorcio is also being sued for defaulting on another loan and Carlos Barrera is under criminal investigation for bouncing checks worth $1.8 million. (Barrera, 1/21/03 Tr., 43:11—44:8).

442. Consorcio is also significantly indebted to other entities and acknowledges being "highly in debt" on the hotel. (Barrera, 1/21/03 Tr., 47:3—47:10; 67:23—68:1).

443. By August 2001, Consorcio had "serious financial difficulties" and a "very tight and difficult financial situation" on the project. (Barrera, 1/21/03 Tr., 88:13—88:16; 89:3—89:4).

444. Consorcio's attitude concerning money issues interfered with Four Seasons' efforts to properly open and operate the Hotel. Four Seasons thus tried to be cognizant of the fact that Consorcio was running short of funds as the hotel approached opening and tried to respond to Consorcio's concerns relating to the expenditures of funds. (Giacometti, 1/7/03 Tr., 40: 11–12). Four Seasons even gave Consorcio a $5 million loan in order to assist Consorcio in completing construction of the hotel. (Barrera, 1/21/03 Tr., 74:9—74:11). And, Four Seasons offered Consorcio an additional $5 million to help it out of its financial difficulties, but Consorcio refused. (Barrera, 1/21/03 Tr., 91:2; 91:20).

445. Despite this effort by Four Seasons, Consorcio's interference in the operation of the hotel actually increased to the point that it was very difficult for Four Seasons to operate the hotel because Four Seasons' staff spent half of their time trying to explain and justify every little thing happening at the hotel to Consorcio. (Giacometti, 1/7/03 Tr., 40:19–23).

446. Nonetheless, Four Seasons did everything within its power to provide guests with a positive experience at the hotel notwithstanding the obstacles being placed

before it by Consorcio. (Giacometti, 1/7/03 Tr., 72:20–25. 73: 1–2).

447. Prior to December 2001, Four Seasons delivered to Consorcio a cash call, a request that the ownership make up deficits in the operation accounts of the hotel. Consorcio did not comply with the cash call. Alternatively, Four Seasons requested that Consorcio make an operational line of credit available to Four Seasons according to the terms of the Management Agreement. (Dunnigan, 1/9/03 Tr. 159: 3–25, 160: 1–12). In the cash call letter, Four Seasons demanded that Consorcio account for those funds which had been removed from the hotel bank account and not used to pay operational expenses of the hotel. Despite that request, no accounting was made and the funds were never repaid. (Dunnigan, 1/10/03 Tr.5: 22–25, 6: 1–4). In fact, Consorcio's arbitrary utilization of the funds was explicitly prohibited by Section 10.04 of the Management Agreement. (Dunnigan, 1/10/03 Tr. 6: 4–14, Plaintiffs' Exhibit 2).

448. When Consorcio did not comply, Four Seasons Corporate notified Consorcio that because of the failure to meet the cash call or to provide for a line of credit, Four Seasons would be taking over the cash management on December 1, 2001, in accordance with the parties' agreements. (Dunnigan, 1/9/03 Tr. 160: 13–21).

449. Four Seasons then took over the management of the cash proceeds from the operation of the hotel pursuant to Section 8.05(b) of the Management Agreement, which entailed processing the credit card receipts into new and different banking accounts and depositing cash receipts into places that were controlled by Four Seasons Caracas, C.A. (Dunnigan, 1/9/03 Tr. 158: 18–25, 159:1–2,193: 8–25, Plaintiffs' Exhibit 2).

450. The bank accounts that were created by Four Seasons in December 2001 were at the Bank of Caracas, which is the same bank where Consorcio had its principal hotel bank accounts. (Dunnigan, 1/9/03 Tr. 195: 7–12).

451. Four Seasons maintained control of the cash until April of 2002. (Dunnigan, 1/9/03 Tr. 160: 22–25, 161: 1–4).

452. During this period of time, Four Seasons received several hundred thousand dollars of revenues for the hotel, all of which was used to pay hotel bills, including many bills and obligations which had gone unpaid by Consorcio. (Dunnigan, 1/9/03 Tr. 161: 5–10).

453. For the period in which Four Seasons controlled the cash accounts of the hotel, i.e., December 2001 through April 2002, Four Seasons took steps to ensure the legitimacy of the payments it made. Specifically, Four Seasons retained Price Waterhouse Coopers and requested that they do a monthly review of the cash disbursements out of the hotel. Every single payment that went out of the hotel was reviewed, and Price Waterhouse Coopers certified that they were ordinary expenses or ordinary disbursements in connection with the operation of the hotel. (Dunnigan, 1/9/03 Tr. 163: 3–12).

454. Price Waterhouse Coopers generated monthly reports on the disbursements and these reports were provided to Consorcio. (Dunnigan, 1/9/03 Tr. 163: 16–20).

455. Four Seasons did not use any part of the revenues from December 2001 to April 2002 to pay itself. Indeed, Four Seasons has never been paid any of the management fees or other fees owed to it by Consorcio. (Dunnigan, 1/9/03 Tr. 161:11–15). Despite having the legal right to take funds from the operation of the hotel in December 2001 through April 2002 to repay itself the approximately $1.8 million U.S. that was owed to it by Consorcio, Four Seasons instead used the proceeds of the hotel operations during that period of

time to pay costs of the hotel, including wages of the employees and overdue and current obligations to some of the vendors. (Dunnigan, 1/10/03 Tr. 7:12–25, 8:1–2).

456. Four Seasons is also owed $200,400.00 for management fees and an additional incentive fee of 10% of gross operative profits which is an additional $60,000.00, for a total of $260,400.00. (Dunnigan, 1/9/03 Tr. 161:16–25, 162: 1–6).

457. Four Seasons has never been re-imbursed by Consorcio for over a half a million dollars in pre-opening expenses. (Dunnigan, 1/9/03 Tr. 162: 8–25, 163: 1–2).

458. Likewise, Consorcio never reim-bursed other Four Seasons hotels that provided staff and other resources to as-sist the Caracas hotel in opening. (Ferra-ro, 1/8/03 Tr., 42:23—43:2).

459. Moreover, during the period De-cember 2001 through April 2002, Four Seasons advanced approximately $800,000.00 to cover deficits in the hotel operation. (Dunnigan, 1/9/03 Tr. 164: 15–18).

460. Over the entire course of the rela-tionship, Four Seasons has advanced at a corporate level approximately $1,776,000.00 to the Four Seasons Hotel in Caracas. (Dunnigan, 1/10/03 Tr. 4: 14–20).

461. Consorcio's actions in taking back control of the cash operations of the hotel, pursuant to Venezuelan court orders, pre-vented Four Seasons from operating the hotel and from managing the cash of the hotel in accordance with its contract and its policies. (Dunnigan, 1/10/03 Tr. 11: 1–7.) Additionally, Consorcio's conduct in retaking possession of the cash manage-ment of the hotel also interfered with and was disruptive to the operation of the hotel by Four Seasons on a number of levels. Four Seasons was unable to establish good working relationships with providers of the hotel because they had not been paid.

Four Seasons was likewise unable to foster a positive employment climate in the hotel because employees were uncertain wheth-er they would get paid. Consorcio's ac-tions were extremely disruptive. Indeed, one of the dishwashers in the Hotel in-formed Four Seasons that when his wife went to the clinic to be treated because she was sick, clinic personnel refused to treat her because Consorcio had not paid the insurance premium. (Dunnigan, 1/10/03 Tr. 11: 12–19).

462. Consorcio's conduct further pre-cluded Four Seasons from operating the Caracas Hotel according to the standards of the Four Seasons chain.

463. Consorcio was in substantial ar-rears with vendors who supplied various products and services necessary for the proper operation of the hotel. Four Sea-sons enjoys favorable relationships with many of these vendors on an international basis, including within the United States. (Lind, 1/6/03 Tr., 77: 13–25, 78: 1–12).

464. Consorcio's failure to pay these vendors over a prolonged period of time marred Four Seasons' reputation and rela-tionships with these vendors that had been built up internationally over many years. (Lind, 1/6/03 Tr., 78: 13–15; 79: 15–16).

465. Approximately fifty percent of the guests at the Four Seasons Caracas came from Four Seasons' corporate relation-ships from the United States, and approxi-mately 10–15% specifically from Florida. (Ferraro, 1/8/03 Tr., 60: 24–25, 61: 1–6; Henry, 1/10/03 Tr., 82: 16–25, 83: 1–5; Lind, 1/6/03 Tr., 90: 22–25).

466. Consorcio's extensive failures to comply with Four Seasons' quality control standards for the Caracas hotel led to actual harm to Four Seasons' reputation with its customers, including its U.S. cus-tomers:

"Q. Do you think that the fact that the Caracas property was not up to the

standards of other Four Seasons hotels had an adverse impact on your brand image as it relates to guests of the hotel in Caracas and guests of the hotels in other places?

A. Yes. I had verbal feedback from several of our regional sales offices saying that they had clients that went there and groups that went there that they asked the question, Is this a Four Seasons hotel? And I have examples."

(Ferraro, 1/08/03 Tr., 56: 17–24).

467. One such example of a U.S. customer complaint was made by the CEO of Kellogg's, the American cereal company. (Ferraro, 1/08/03 Tr., 57: 1–6). Another example related to a customer complaint from Goldman Sachs—the highly regarded investment bank in New York—made to a travel representative—also in New York:

Q. What was the nature of the complaint?

A. It wasn't a Four Seasons hotel.

Q. What do you mean?

A. There was no artwork in the hotel. The rooms had paper Kleenex boxes. It [was] Mickey Mouse. The suites weren't furnished. We had no suites in the hotel, maybe one or two. And all the furniture was borrowed. The music systems didn't work. The lighting was poor. The whole thing wasn't a Four Seasons hotel.

(Ferraro, 1/08/03 Tr., 57: 23–25, 58: 1–8).

468. There were other complaints from American customers who stayed at the hotel in Caracas that were dissatisfied with the Four Seasons' standards not being met. (Lind, 1/6/03 Tr., 91: 1–4). These complaints came from guests that were top-ranking executives of well-known American corporations such as Exxon–Mobil and Chevron, who were familiar with Four Seasons elsewhere in the world and who complained that the Caracas hotel was not up to the Four Seasons' standards. (Lind, 1/6/03 Tr., 91: 6–25, 92: 16).

469. Four Seasons made repeated requests to Consorcio to conform to the quality control standards of Four Seasons, but Consorcio never complied. (Ferraro, 1/8/03 Tr., 58: 13–24).

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter.

2. In this civil action, Four Seasons' burden of proof is a mere preponderance of the evidence. *Sandoval v. Hagan,* 7 F.Supp.2d 1234, 1245 (M.D.Ala.1998).

3. "A preponderance of the evidence means such evidence as, when considered with that opposed to it, has more convincing force, and demonstrates that what is sought to be proved 'is more likely true than not true.'" *Id.* (citing *Eleventh Circuit Pattern Jury Instructions*).

4. A fact has been proven by a preponderance of the evidence if the scales tip, however slightly, in favor of the party with the burden of proof as to that fact. *Blossom v. CSX Transp., Inc.,* 13 F.3d 1477, 1479–80 (11th Cir.1994).

### Count I—Computer Fraud and Abuse Act

5. Count I of Four Seasons' Amended Complaint alleges that Consorcio violated the Computer Fraud and Abuse Act ("CFAA"), as codified at 18 U.S.C. § 1030.

6. While the CFAA is a criminal statute, the private right of action contained in 18 U.S.C. § 1030(g) provides that any person who suffers damage or loss by reason of a violation of clause (i) of subsection (a)(5)(B) of the CFAA may maintain a civil action against the violator for compensatory damages and injunctive relief.

7. Clause (i) of subsection (a)(5)(B), in turn, encompasses all of the conduct described in clause (i), (ii), or (ii) of subparagraph (A) of the statute, including attempted violations, provided that the conduct caused (or in the case of an at-

tempted violation, would if completed, have caused) loss within a one-year period of at least $5,000 in value in the aggregate. *See* 18 U.S.C. § 1030(a)(5)(B)(i).

8. The term "loss" is defined in subsection (e)(11) to include "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, systems, or information to its condition prior to the offense." *See* 18 U.S.C. § 1030(e)(11). *See also EF Cultural Travel BV v. Explorica, Inc.,* 274 F.3d 577, 585 (1st Cir.2001) (loss under CFAA includes remedial and investigative expenses incurred by plaintiff); *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.,* 119 F.Supp.2d 1121, 1126–27 (W.D.Wash.2000) (same).

9. The term "damage" is defined in subsection (e)(8) to mean "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

10. Subsection (a)(5)(A) creates liability under the statute for

> Whoever ... (i) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; (ii) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or (iii) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage.

18 U.S.C. § 1030(a)(5)(A).

11. The term "protected computer" is defined in subsection (e)(2)(B) to mean a computer "which is used in interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." 18 U.S.C. § 1030(e)(2)(B).

■ 12. The Court concludes that Four Seasons prevails under Count I because a preponderance of the evidence demonstrates that Consorcio has violated the CFAA in five ways.

13. First, in violation of subsection (a)(5)(A)(ii), (iii) and (a)(5)(B), Consorcio attempted on numerous occasions within a one-year period to intentionally access without authorization Four Seasons' protected computers located both within and outside of the United States. These intentional access attempts by Consorcio were committed by "spoofing" the IP addresses of Four Seasons, thereby causing damage within the scope of the statute. Specifically, Consorcio's spoofing, which is analogous to forgery, impaired the integrity of Four Seasons' computer systems. Consorcio's spoofing of IP addresses also caused damage by impairing the availability of the computer that was spoofed. Even Consorcio's expert witness conceded that spoofing impairs the availability of the computer that is spoofed.[1]

14. Second, in violation of subsection (a)(5)(ii) and (iii), Consorcio's intentional attempts to access remote computers within the Four Seasons' protected network involved actual access of the Four Seasons OpenReach VPN device in Caracas, as these transmissions were sent to this protected computer for transmission to the

---

1. Furthermore, based on the deliberate destruction of electronic data from a Consorcio computer at the heart of this controversy, the Court draws an inference adverse to Consorcio that such deleted information constituted confidential customer and financial data of Four Seasons.

remote computers within the Four Seasons' trusted computer network. *See America Online, Inc. v. National Health Care Discount, Inc.,* 121 F.Supp.2d 1255, 1273 (N.D.Iowa 2000) (holding that, for purposes of the CFAA, an e-mail transmission "accesses" each and every computer it is transmitted to on its way to its intended destination).

■ 15. Third, in violation of subsection (a)(5)(i), Consorcio's spoofing of Four Seasons' computers, in and of itself, constitutes the unlawful, intentional transmission of a program, code or command that causes damage, as discussed directly above.

16. Fourth, also in violation of subsection (a)(5)(i), the unauthorized broadcast traffic transmitted by Consorcio caused congestion on the Four Seasons' VPN device, thereby impairing the availability of that computer to other systems in the network and thus qualifying as damage under the statute. *See America Online, Inc.,* 121 F.Supp.2d at 1274 (large volume of unsolicited bulk e-mail caused slowdowns and diminished capacity of computers, thereby impairing the availability of a system within the definition of damage under the CFAA); *see also, America Online, Inc. v. National Health Care Discount, Inc.,* 174 F.Supp.2d 890, 899 (N.D.Iowa 2001) (same; punitive damages and attorney's fees awarded under supplemental claims).

17. Finally,. in addition to the unlawful access attempts, the Court finds that Consorcio violated subsection (a)(5)(A)(ii) and (iii) by intentionally accessing Four Seasons' protected computers and thereby obtaining information of value in the form of confidential customer and financial data. In this regard, the evidence shows that Consorcio was found in. possession of files taken "directly from Fidelio," which Consorcio was not entitled to have access to, and moreover that Consorcio attempted to conceal its possession of this information by deleting it from a computer prior to its court-ordered inspection.[2] Further, on another occasion, Consorcio intentionally ac-

---

2. The Court rejects Consorcio's argument that this customer information was not obtained by unlawful computer access, but rather was voluntarily provided by Four Seasons to Consorcio on floppy diskettes. Not only is the Four Seasons' representative who allegedly provided the proprietary information on these diskettes the son of Consorcio's president and principal shareholder, the diskettes offered into evidence by Consorcio were proven to be forgeries. Fabrication of evidence of this nature, especially as it relates to a material issue in the case, would be grounds for the entry of a default judgment against Consorcio, if the Court were not to rule in favor of Four Seasons on the merits. *Vargas v. Peltz,* 901 F.Supp. 1572, 1575 (S.D.Fla.1995) ("It is therefore undisputed that Plaintiff could not have received the panties from Peltz in September, 1992 since those panties were not even sold by the manufacturer—Van Mar, Inc.—until November, 1993, more than one year later. Plaintiff's testimony cannot be reconciled with this undisputed evidence pre-

sented by Elliot Management. The Court finds that Plaintiff lied and presented false evidence when she introduced the women's panties at her May 24, 1994 deposition, Exhibit 70, and offered the descriptive testimony above under oath in support of her claims of sexual harassment.") (dismissal entered). *See also McDowell v. Seaboard Farms of Athens, Inc.,* 1996 WL 684140, at *2, 10 Fla. L. Weekly Fed. D 355 (M.D.Fla. Nov.4, 1996) ("When a party fabricates evidence purporting to substantiate its claims, federal case law is well established that dismissal is appropriate.").

Just like the fabricated panties in *Vargas,* Consorcio's "diskettes" did not even exist at the time they were allegedly provided to Consorcio. Consorcio, therefore, has presented false evidence to this Court, and lied about it under oath at trial, in an attempt to escape liability for violating the CFAA, ECPA and the Uniform Trade Secrets Act. The striking of Defendant's Answer and the entry of default judgment in favor of Plaintiffs would be warranted under these circumstances if the Court

cessed, and made extensive copies of data from, Four Seasons' Fidelio and Scala computer servers located in Caracas, which qualify as protected computers under the CFAA.[3] The value of the information obtained from these acts, which Four Seasons' hotel industry expert credibly established as $2,090,000, is clearly in excess of the statutory threshold. Moreover, customer information has previously been held to constitute a property interest sufficient to satisfy the damage requirement of the CFAA. *In re America Online, Inc.*, 168 F.Supp.2d 1359, 1380 (S.D.Fla.2001) (citing *Newark Morning Ledger Co. v. U.S.*, 507 U.S. 546, 568–70, 113 S.Ct. 1670, 123 L.Ed.2d 288 (1993)).

18. Additionally, as a result of each of the foregoing violations, Four Seasons suffered "loss" under the statute of $28,000 in expenses incurred in investigating and responding to these offenses, which occurred within a one-year period. This measure of loss is applicable to each violation described above.

19. Accordingly, judgment shall be entered in favor of Four Seasons and against Consorcio under Count I of the Amended Complaint. Compensatory damages in the amount of $2,118,000 shall be awarded and a permanent injunction entered.

### Count II—Electronic Communications Privacy Act

20. Count II of Four Seasons' Amended Complaint alleges that Consorcio has violated the Electronic Communications Privacy Act (the "ECPA"), as codified at 18 U.S.C. § 2511.

21. Section 2520 of Title 18 provides a private right of action for violations of the ECPA. A prevailing plaintiff may recover compensatory and punitive damages, injunctive relief and attorney's fees. *See* 18 U.S.C. § 2520(b).

22. Section 1(a) of the ECPA makes it unlawful to intercept, or to endeavor to intercept, any electronic communication. *See* 18 U.S.C. § 2511(1)(a).

23. The Court incorporates the findings of fact applicable to the CFAA claim to this claim under the ECPA. The preponderance of the evidence establishes that Consorcio has endeavored to access the protected internal computer network of Four Seasons, including its computer systems in the United States. It is beyond serious dispute that internal electronic mail communications of Four Seasons would have been accessible to Consorcio if its unlawful access attempts were successful. Based on the adverse inference this Court has drawn against Consorcio in light of its spoliation of evidence in this case, the Court concludes that Consorcio has violated the ECPA by intercepting, or at a minimum endeavoring to intercept, Four Seasons' electronic communications.

24. No damages will be awarded under Count II, as the contents of the communications inferred to have been in-

---

were not to reach the merits and find in favor of Plaintiffs on each of these claims.

**3.** The Court rejects Consorcio's argument that this download was "not unauthorized" on account of a Venezuelan court order. First, the License Agreement between the parties is clear that Consorcio is not entitled to confidential customer information kept by Four Seasons in electronic form, and it is equally clear that Consorcio is not entitled to the complete customer profiles which were taken

in any form. Second, the Venezuelan order in question, notably obtained on an *ex parte* basis and self-executed by Consorcio, was in direct conflict with a then-existing Preliminary Injunction of this Court. Consorcio neither informed the Venezuelan court of the existence of this Court's injunction, nor applied to this Court for a modification. Moreover, this action was filed well prior to the action in Venezuela, such that if any issue of international comity is implicated here, it is this Court's authority that was impugned.

tercepted are unavailable for evaluation. However, in the exercise of its discretion, the Court shall enter an award of attorney's fees and costs and shall enter a permanent injunction pursuant to 18 U.S.C. § 2520(b).

### Count III—Uniform Trade Secrets Act

25. Count III of Four Seasons' Amended Complaint alleges that Consorcio violated the Uniform Trade Secrets Act, as codified at Fla. Stat. §§ 688.001–688.009.

26. The statute defines misappropriation of a trade secret as follows:

"Misappropriation" means:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

1. Used improper means to acquire knowledge of the trade secret; or

2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:

  a. Derived from or through a person who had utilized improper means to acquire it;

  b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

  c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

3. Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Fla. Stat. § 688.002(2).

27. "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. Fla. Stat. § 688.002(1).

28. A trade secret can include any information that has economic value because it is not generally known to or readily ascertainable by others, and it must be subject to reasonable efforts to protect its secrecy. Fla. Stat. § 688.002(4).

29. Actual or threatened misappropriation may be enjoined. Fla. Stat. § 688.002. Additionally, in appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order. Fla. Stat. § 688.003(3).

30. A complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any compensatory award. Fla. Stat. § 688.004.

31. Reasonable attorney's fees may also be awarded in a case of willful and malicious misappropriation. Fla. Stat. § 688.005.

■ 32. The Court concludes that Consorcio is liable for misappropriation of trade secrets under Count III of the Amended Complaint.

■ 33. First, Four Seasons' detailed customer profiles qualify as trade secrets under the statute, as this information has economic value, is not generally known or readily available by others, and is the subject of reasonable efforts by Four Seasons to preserve its secrecy. *See Unistar Corp. v. Child,* 415 So.2d 733, 734 (1982) (customer information protected as trade secrets); *Delucca v. GGL Indus., Inc.,* 712 So.2d 1186, 1187 (1998) (same); *Kavanaugh v. Stump,* 592 So.2d 1231, 1232 (1992) (same);

*East Colonial Refuse Serv., Inc. v. Velocci,* 416 So.2d 1276, 1278 (1982) (same).

34. Second, as discussed in the section concerning Count I, Consorcio has acquired this customer information through improper means, namely, by theft and by espionage through electronic means.

■ 35. In so holding, the Court rejects Consorcio's argument that it is entitled to Four Seasons' detailed customer profiles under the License Agreement. First, the "guest histories" licensed to Consorcio under the Agreement are expressly limited to hard copies, not the electronic profiles which were misappropriated. Second, the hard copies of "guest histories" to which Consorcio asserts entitlement do not include all of the detailed customer information maintained by Four Seasons as guest profiles. The preponderance of the evidence established that "guest histories" provided to an owner under a License Agreement are limited to the names of guests and their dates of arrival and departure, but do not include the guests' personal preferences and a myriad of other information, including the guests' credit card numbers and home addresses and telephone numbers, that constitute a "guest profile."

36. Third, even if, *arguendo*, this Court were to accept a definition of "guest history" broader than that contained in the Agreement itself and Four Seasons' practices with other owners,[4] Consorcio is estopped from relying on the Agreement in any event because it has breached the Agreement in several respects, including the complete failure to pay any royalties associated with the license.

37. Accordingly, judgment shall be entered in favor of Four Seasons and against Consorcio under Count III. With respect to damages, as noted in the CFAA discussion, the Court accepts the uncontroverted testimony of plaintiffs' hotel industry expert that the value of the misappropriated customer information from Caracas is $2,090,000, and concludes that this amount shall be awarded as compensatory damages.

38. Based on Consorcio's spoliation of evidence, the Court has drawn an inference that Consorcio's computer hacking activities were successful. Therefore, since several of Consorcio's hacking attempts were directed at Four Seasons' central reservations system, the Court could reasonably conclude that Consorcio succeeded in misappropriating trade secrets related to all of Four Seasons' worldwide customers, which would result in a demonstrably higher compensatory damages award.[5] For purposes of assessing damages, however, the Court declines to infer that the worldwide customer list was misappropriated in its entirety.

■ 39. However, based on the fact that Consorcio's computer hacking activities were unquestionably intentional, the Court exercises its discretion under the Uniform Trade Secrets Act to double the compensatory damages award.

40. A permanent injunction shall also issue, which shall include an affirmative order that Consorcio make all of its com-

---

4. Four Seasons does not provide its "guest profiles" to any owner. Moreover, this Court has viewed the information stored in the Fidelio customer information database and notes the difference between a "guest history" and a "guest profile." As noted in the Findings of Fact, Consorcio also acknowledged at trial that the guest histories it received pursuant to the parties' contract were limited to guest names and dates of arrival and departure, and did not include the detailed information contained in a guest profile.

5. Plaintiffs' hotel industry expert valued the worldwide customer information at between $78—$97.5 million US.

puters available for inspection by plaintiffs' computer forensic expert, at Consorcio's expense, to ensure that Consorcio has not retained any trade secrets misappropriated from Four Seasons. The Court also notes that these remedies are particularly appropriate on the facts of this case, where Consorcio has sought to terminate its contracts and business relationship with Four Seasons and has met with a number of Four Seasons' competitors concerning the replacement of Four Seasons as the manager and operator of the Caracas hotel. It is self-evident that Four Seasons' customer information would be of significant economic value in the hands of those competitors.

### Counts IV, V and VIII—Lanham Act Unfair Competition, Trademark Infringement and Trademark Dilution

41. Count IV of the Amended Complaint alleges federal unfair competition under Section 43(a) of the Lanham Act, as codified at 15 U.S.C. § 1125(a). Count V alleges federal trademark infringement under Section 32 of the Lanham Act, as codified at 15 U.S.C. § 1114. Count VIII alleges federal trademark dilution under Section 43(c) of the Lanham Act, as codified at 15 U.S.C. § 1125(c).

42. The purpose of the Lanham Act is two-fold: first, to protect consumers from confusion, mistake or deception regarding the nature and quality of goods and services, and second, to prevent impairment of the goodwill and reputation of trademark owners. *See, e.g., Intel Corp. v. Terabyte Int'l, Inc.,* 6 F.3d 614, 618–19 (9th Cir.1993) ("The public relies upon the mark so that 'it will get the product which it asks for and wants to get.'") (citation omitted.).

43. In the trademark licensing context, "the Lanham Act carries forward the modern rule permitting the controlled licensing of trademarks. The Lanham Act imposes an affirmative duty upon the trademark licensor to control the quality of goods and services which reach buyers under the licensed mark." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 18.50 (4th ed.2003).

44. "The licensor owes an affirmative duty to the public to assure that in the hands of his licensee the trademark continues to represent that which it purports to represent. For a licensor, through relaxation of quality control, to permit inferior products to be presented to the public under his licensed mark might well constitute misuse of the mark." *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43, 51 (9th Cir.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972) (citing 15 U.S.C. §§ 1055, 1127). *See also Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 366 (2d Cir.1959) (the Lanham Act "places an affirmative duty upon a licensor of a registered trademark to take reasonable measures to detect and prevent misleading uses of his mark by his licensees or suffer cancellation of his federal registration."); *Mini Maid Services Co. v. Maid Brigade Systems, Inc.,* 967 F.2d 1516, 1519 (11th Cir.1992) ("By requiring a licensor to supervise a licensee's use of its own mark and to some extent a licensee's operations under that mark, the law attempts to ensure that the public will not be deceived when purchasing goods and services that relate to that trademark.").

45. McCarthy provides that:

A trademark carries with it a message that the trademark owner is controlling the nature and quality of the goods or services sold under the mark. Without quality control, this message is false because without control of quality, the goods or services are not truly 'genuine.' This dissonance and deception erodes the significance of the designation as an

accurate indication of origin: a trademark. A product is not truly 'genuine' unless it has been manufactured and distributed under quality control standards established by the manufacturer. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 18.42 (4th ed.2003) (emphasis added).

■ 46. "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark.... For this purpose the actual quality of the goods is irrelevant: it is the control of quality that a trademark holder is entitled to maintain." *El Greco Leather Products Co. v. Shoe World, Inc.,* 806 F.2d 392, 395 (2d Cir.1986), *cert. denied,* 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987).

47. McCarthy further provides that:

"A trademark licensee's right to use of a mark is defined by the valid terms of the trademark license. That is, the license defines the boundaries of the licensee's permitted use. The fact that the license is silent on a particular type of use of the mark does not mean that such a use is permitted. To the contrary, a confusing use of the mark which is not permitted in the license is forbidden and would be trademark infringement. *Any sales of goods or services which are outside the area of consent granted in the license are regarded as infringements of the mark. Similarly, the licensee's use of the mark in a composite or format other than that permitted by the license constitutes an infringement.... Similarly, a licensee who sells, under the licensed mark, goods which do not measure up to the licensor's quality standards, is liable for trademark infringement by the unauthorized use of the mark. It is both trademark infringement as well as breach of contract for a manufacturing franchisee to make and sell a product which does not meet the trademark owner/franchisor's quality specifications."* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 18.42 (4th Ed.2003) (citing cases; emphasis added).

■ 48. An action for trademark infringement arises where a person, without the consent of the registrant, uses in commerce any registered mark in connection with the sale of any goods and where such use is likely to cause confusion. *See* 15 U.S.C. § 1114(1)(a). Furthermore,

[d]istribution of a product that does not meet the trademark holder's quality control standards may result in the devaluation of the mark by tarnishing its image. If so, the non-conforming product is deemed for Lanham Act purposes not to be the genuine product of the holder and its distribution constitutes trademark infringement.

*Warner–Lambert Co. v. Northside Dev. Corp.,* 86 F.3d 3, 6 (2d Cir.1996).

49. As the Fourth Circuit held in an analogous controlled licensing case:

The use of the Shell marks implies that the product has been delivered according to all quality control guidelines enforced by the manufacturer. The district court found that Commercial does not follow Shell quality control procedures, and there was, therefore, a likelihood of customer confusion as to the quality and source of the bulk oil. The court considered the evidence 'more than ample' to show likelihood of confusion, and the district court's findings of fact are not clearly erroneous. We affirm its conclusion that Commercial's use of Shell's marks was deceptive and likely to confuse consumers who rely on the trademarks as symbols of Shell quality.

*Shell Oil Co. v. Commercial Petroleum, Inc.,* 928 F.2d 104, 108 (4th Cir.1991). *See also Adolph Coors Co. v. A. Genderson & Sons, Inc.,* 486 F.Supp. 131, 135–36 (D.Colo.1980) ("the acts of defendant in this controversy pose a threat to the quality assurance function of trademarks.... Here, defendant is engaged in reselling a product of inferior quality. Defendant's acts are likely to affect adversely the goodwill of Coors and cause irreparable harm and damage to Coors' reputation for high quality beer, and likely to dilute the distinctive quality of Adolph Coors Company trademarks and trade name."); *Tandy Corp. v. Marymac Indus., Inc.,* 213 U.S.P.Q. 702, 704, 1981 WL 48195 (S.D.Tex.1981) ("Tandy Corporation has an affirmative duty under Section 15 of the Lanham Act, 15 U.S.C. § 1055, to protect its service mark from infringement and to control its use by Tandy licensees. Tandy has a right to control the use of its service mark so as to maintain and shape the good will that exists in the mark.").

50. The parties dispute the relative significance of the trademark violations related to the condominium marketing materials. Four Seasons deems all of the alleged trademark violations to be significant because it has an affirmative legal duty as well as an economic interest to control the use of its marks. Consorcio, on the other hand, characterizes the marketing material violations as minor. Consorcio's argument on this point, however, is irrelevant as a matter of law. *Christian Dior, S.A.R.L. v. Miss Dior of Flatbush, Inc.,* 173 U.S.P.Q. 416, 418 (E.D.N.Y.1972) ("The minor character of an infringement does not permit a series of small businesses 'to nibble away or dilute the value of the goodwill which Plaintiff has established.'" (quoting *Es-*

*quire, Inc. v. Maira,* 101 F.Supp. 398, 402 (M.D.Pa.1951))).

█ 51. Moreover, as a matter of law, whether the goods or services are in fact inferior is not a prerequisite to a finding of infringement. *Babbit Elecs., Inc. v. Dynascan Corp.,* 38 F.3d 1161, 1180–81 (11th Cir.1994). Consorcio's argument at trial that "the brochures look great to them" therefore misses the point. It is undisputed that Consorcio does not own the Four Seasons trademarks nor does it have the right to control their use.

█ 52. An unfair competition claim based upon the unauthorized use of a trademark is practically identical to a claim of trademark infringement. *See Sun–Fun Prods., Inc. v. Suntan Research & Dev., Inc.,* 656 F.2d 186, 192 (5th Cir. Unit B 1981).[6] Therefore, the Court will employ the same analysis under Counts IV and V.

53. Under Section 32 of the Lanham Act, a defendant is liable for trademark infringement if (a) the plaintiff owns a valid trademark, and (b) the defendant used the trademark, or a colorable imitation thereof, in a manner that is likely to cause confusion or to cause mistake or to deceive. *See* 15 U.S.C. § 1114(1).

█ 54. Four Seasons has met its burden of establishing a valid trademark by offering into evidence its federal trademark registrations. *See* 15 U.S.C. §§ 1115(a) and (b); *see also, Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.,* 51 F.3d 982, 986 (11th Cir.1995) (challenge to trademarks "unfounded" in light of plaintiff's federal registrations).

█ 55. Additionally, Consorcio is estopped from challenging the validity of the

---

**6.** Decisions rendered by the former Fifth Circuit prior to October 1, 1981 were adopted as binding precedent by the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

marks because it has acknowledged their validity under Sections 5.01 and 5.03 of the License Agreement. *See Bunn–O–Matic Corp. v. Bunn Coffee Serv., Inc.,* 88 F.Supp.2d 914, 927 (C.D.Ill.2000) (licensee estopped from challenging validity of trademarks).

56. Moreover, the marks "Four Seasons" and the "tree logo" are arbitrary, inherently distinctive marks, as they neither describe nor suggest the nature of services provided under the marks, namely, hotel services, travel services, and marketing of residential apartments. As inherently distinctive marks, these marks are entitled to a high degree of protection. *Frehling Enters., Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330, 1335–36 (11th Cir.1999).

57. In addition to the fact that Four Seasons' marks are registered on the Principal Register of the United States Patent and Trademark Office, several of the marks asserted in this action are incontestable pursuant to 15 U.S.C. § 1065. (Plaintiffs' Exhibit 57). Under Section 1115(b) of the Lanham Act, these registrations are conclusive evidence of the validity of the marks, of their registrations, of their ownership by Four Seasons, and of Four Seasons' exclusive right to use the marks.

58. The touchstone of liability under Section 32 and Section 43(a) of the Lanham Act is whether there is a likelihood of consumer confusion, deception or mistake; actual harm need not be shown to establish a violation of these sections of the Act. *E. Remy Martin & Co. v. Shaw–Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1529 (11th Cir.1985); *Babbit Elecs., Inc.,* 38 F.3d at 1179 n. 4.

59. The factors that are used to determine whether there is a likelihood of confusion are: 1) the type of trademark at issue; 2) the similarity of design; 3) the similarity of services; 4) the identity of the purchasers and similarity of retail outlets; 5) the similarity of advertising campaigns; 6) the defendant's intent; and 7) actual confusion. *Babbit Elecs., Inc.,* 38 F.3d at 1178.

60. Moreover, in the Eleventh Circuit, "a likelihood of confusion can be found as a matter of law if the defendant intended to derive a benefit from the plaintiff's trademark." *Babbit Elecs., Inc.,* 38 F.3d at 1179.

61. The marks used by Consorcio are identical, used on the identical services, marketed in the same channels of trade to the same types of customers, and in many cases, to the very same customers. And while evidence of actual confusion is not a prerequisite to a finding of likely confusion, *Babbit Electronics, Inc.,* 38 F.3d at 1179 n. 4, there is evidence in this case of actual confusion by multiple Four Seasons' customers who stayed at the Caracas hotel and complained that it "wasn't a Four Seasons" and who wondered "is this a Four Seasons hotel"? Moreover, it is beyond serious dispute that Consorcio intended to derive a benefit from the use of Four Seasons' trademarks.

62. Consorcio's use of the marks is likely to confuse, cause mistake or deceive as to Four Seasons' approval of such use where the greater weight of evidence at trial demonstrated that while Consorcio obviously intended to derive a benefit from the use of Consorcio's marks, Consorcio did not maintain or follow Four Seasons' quality control standards as required by the License Agreement, nor did Consorcio pay any of the royalties due for use of the trademarks. Indeed, as the evidence demonstrated at trial, Consorcio's failures to comply with Four Seasons' quality control standards were numerous and substantial, including, among other things, significant areas of the hotel that were incomplete and unfurnished. As noted in the preceding authorities, a trademark licensee com-

mits trademark infringement when it uses the trademarks in violation of the terms of the trademark license.[7]

63. Accordingly, this Court concludes that Consorcio has violated Sections 32 and 43(a) of the Lanham Act and enters judgment in favor of Four Seasons and against Consorcio on Counts IV and V of the Amended Complaint.

64. Pursuant to 15 U.S.C. § 1116, the Court shall enter a permanent injunction.

65. Under the Lanham Act, damages for trademark infringement and unfair competition may include (1) the defendant's profits, (2) any damages sustained by the trademark owner, and (3) costs of the action. *See* 15 U.S.C. § 1117. Accordingly, the Court shall award Four Seasons its damages, calculated as the amount of unpaid royalties due under the License Agreement, which amount was established at trial as $334,800.00. *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir.1986) ("[r]oyalties normally received for the use of a mark are the proper measure of damages for misuse of those marks") (damage award compensated for Ramada's lost reputation while hold-over franchisee was operating hotel poorly) (quotation omitted). *See also Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1520 (11th Cir.1990) ("any unfavorable reaction of the [defendant's] patrons are likely to be attributed to the franchise as a whole and diminish its reputation") (royalty-based damages award).

66. Additionally, because Consorcio has withheld information concerning its recent sales of residential apartments utilizing the Four Seasons marks from Plaintiffs, the Court shall order an accounting under the supervision of the United States District Court of Consorcio's unreported sales to ensure a complete recovery.

67. The Court notes that because Consorcio continued to use the marks after receiving complaints from Four Seasons about its non-compliance with the License Agreement, after receiving notice of this lawsuit, and with full knowledge that it did not pay any of the royalties due for use of the marks under the License Agreement, this case is likely "exceptional" within the meaning of 15 U.S.C. § 1117. In such circumstances, the Court may award plaintiffs their attorney's fees and costs. *Ramada Inns, Inc.*, 804 F.2d at 1568 (affirming treble damages and attorney's fees); *Nutrivida, Inc. v. Inmuno Vital, Inc.*, 46 F.Supp.2d 1310, 1318 (S.D.Fla.1998) (continued use after receipt of cease and desist letter made the case "exceptional" for purposes of entitlement to attorney's fee award under the Lanham Act). As provided in the Final Judgment entered contemporaneously herewith, the Court reserves decision on an award of fees and costs.

68. The findings of fact relevant to the discussion under Counts IV and V are also relevant to Plaintiffs' federal trademark dilution claim under Count VIII.

69. The Court concludes that Consorcio has committed trademark dilution in violation of Section 43(c) of the Lanham Act. First, the Court has no difficulty in concluding that the Four Seasons

7. In addition to the use of the marks by Consorcio outside of the scope of the trademark license which constitute direct trademark infringement under the Lanham Act, Consorcio's "willful blindness" in permitting Banco Mercantil to display Four Seasons' trademark on the exterior of Consorcio's building constitutes contributory trademark infringement. *See Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1148–50 (7th Cir.1992) (holding that a flea market operator could be held contributorily liable for its "willful blindness" to trademark infringement by those on its premises); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264–65 (9th Cir.1996) (same).

mark qualifies as a famous mark under § 43(c) in light of the following factors: (a) the inherent distinctiveness of the mark; (b) the 40 year use of the mark; (c) the extensive advertising on a worldwide basis; (d) the global presence of its hotels; (e) the extensive accolades and recognition the mark has received in its industry; (f) the lack of credible evidence of any third party use; and (g) the existence of multiple federal trademark registrations for the mark. *See* 15 U.S.C. § 1125(c). *See also, J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition,* § 24:92:1 (4th Ed.2003) (citing examples of marks held to be famous).

70. The Court also notes that Consorcio conceded at trial that the mark "Four Seasons" is a world famous mark.

71. Additionally, the Court concludes that Consorcio's failure to comply with the quality control standards of the License Agreement diminished the capacity of the mark to distinguish the high quality of Plaintiffs' services. In this regard, the record reflects evidence of actual harm to Four Seasons in the form of customers who complained that the Caracas hotel "wasn't a Four Seasons" due to its sub-

standard nature, incomplete construction and inferior furnishings and finishings. This constitutes evidence of actual harm to establish trademark dilution under the Lanham Act. *Moseley v. V Secret Catalogue, Inc.,* 537 U.S. 418, 123 S.Ct. 1115, 1124, 155 L.Ed.2d 1 (2003) (requiring evidence of actual harm under Section 43(c) claim, but stating "[t]hat does not mean that the consequences of dilution, such as an actual loss of sales or profits, must also be proved.").[8]

72. Pursuant to 15 U.S.C. § 1116, a permanent injunction will issue under Count VIII of the Amended Complaint.

### Counts VI and VII—Florida Unfair Competition and Trademark Infringement

73. The same facts and legal analysis that give rise to Consorcio's liability for federal unfair competition and trademark infringement compel the conclusion and finding that Consorcio is also liable under Counts VI and VII for common law unfair competition and trademark infringement. *Victoria's Cyber Secret Limited Partnership v. V Secret Catalogue, Inc.,* 161 F.Supp.2d 1339, 1355–56 (S.D.Fla.2001)

---

**8.** Section 43(c) was added to the Lanham Act in 1995. Prior to that, there was no federal remedy for unauthorized use of a trademark by an entity not in competition with a trademark owner (section 43(c), however, is not limited to noncompeting uses only). After the trial of this action, the Supreme Court issued its decision in *Moseley* to resolve a split in the Circuits regarding whether the standard for federal trademark dilution was a "likelihood" of dilution as in the trademark infringement (Section 32) and unfair competition (Section 43(a)) contexts, or whether actual harm must be shown. Based on the comparative absence of the term "likely" in Section 43(c)—as opposed to the presence of the term "likely" in Section 32 and Section 43(a)—the Court concluded that some evidence of actual harm is required for a dilution claim. *Moseley,* —— U.S. at ——, 123 S.Ct. at 1124. However, the Court specifically held that proof of the conse-

quences of that harm is not required. *Id.* In discussing the evidence before it, the Supreme Court noted that although a confusingly similar use of the "Victoria's Secret" mark caused a customer to form a mental association with the well-known lingerie chain, the evidence did not show that the defendant's use caused the customer to form a "different impression" of the famous chain. *Id.* In contrast, patrons of Four Seasons worldwide complained to Four Seasons' sales representatives that the Caracas Hotel, albeit designated a Four Seasons by Consorcio's use of the mark, "wasn't a Four Seasons." These customers, therefore, plainly formed a different, negative impression of the chain. Moreover, the complaints were directed *at* Four Seasons, not Consorcio. *Id.* (noting that the customer complaint "was directed entirely at petitioners, not at respondents.").

(federal trademark analysis applies to state trademark and unfair competition claims). The same damages and injunctive relief awarded under the federal trademark counts are also applicable here.

### Count IX—Florida Trademark Dilution

74. Unlike federal trademark dilution (at least since *Moseley* ), a claim for dilution under Florida law requires only "a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark." Fla. Stat. § 495.151. *See Tortoise Island Homeowners Ass'n, Inc. v. Tortoise Island Realty, Inc.,* 790 So.2d 525, 534 (2001).

75. Also unlike the federal trademark dilution statute, the Florida antidilution statute is not limited to "famous" marks. *See* Fla. Stat. § 495.151.

76. While the statute applies by its terms "notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services" (*id.*), the absence of competition or confusion is not a prerequisite to the statute, as Consorcio has argued. This is evident not only from use of the term "notwithstanding" in the statute, but also from those decisions finding a defendant liable under federal trademark infringement laws and under the Florida antidilution statute. *See, e.g., General Conference Corp. of Seventh–Day Adventists v. Perez,* 97 F.Supp.2d 1154 (S.D.Fla.2000).

77. Under the same facts relevant to the federal dilution claim, the Court concludes that Consorcio is liable under Count IX. The same injunctive relief awarded under the federal dilution claim is applicable here.

### Count X—Breach of Contract

78. The grant of license contained in Section 3.01 of the License Agreement is made "upon and subject to the terms and conditions set forth in this Agreement." (License Agreement, Plaintiffs' Exhibit 1).

79. The Court concludes that based on the preponderance of the evidence, Consorcio has breached the terms and conditions of the License Agreement in the following ways:

a) By failing to conform to the quality standards required by Section 4.01;

b) By failing to cooperate with Four Seasons to ensure the quality standards set forth in Section 4.01 are satisfied as required by Section 4.02;

c) By failing to correct deficiencies in the quality control standards after being provided with notice of substantial deficiencies as required by Section 4.03;

d) By failing to utilize the trademarks only in such manner and format as are specifically approved by Four Seasons as required by Section 5.02(a);

e) By using the trademarks in a manner that, in Four Seasons' judgment, is in bad taste, or which is not consistent with Four Seasons' public image, or which disparages Four Seasons' reputation, as required by Section 5.02(d);

f) By failing to cooperate with Four Seasons in connection with the protection or enforcement of the trademarks, and by failing to promptly advise Four Seasons in writing of potentially infringing uses of the trademarks, as required by Section 5.03;

g) By taking action which precludes the Hotel from being operated in accordance with Four Seasons' policies and procedures as required by Section 5.05;

h) By failing to pay any of the royalty fees as required by Sections 7.01 and 7.03; and

i) By failing to reimburse Four Seasons for all reasonable costs and expenses incurred by Four Seasons in the performance of the Agreement.

80. Damages in the amount of $334,800 for unpaid royalty fees flowing from the above breach are awarded to Four Seasons. While the unpaid royalty fees were used to calculate Plaintiffs' damages under the Lanham Act, the Eleventh Circuit has held that it is not a double recovery when a trademark owner receives an award of trademark damages based upon a contractual royalty, and a separate award of contract damages based on the same royalty. To hold otherwise would provide a trademark licensee with an incentive to infringe and would undermine the purpose behind the Lanham Act. *Ramada Inns, Inc.*, 804 F.2d at 1566–67.

81. Plaintiffs have shown a valid contract, breach and damages. Judgment in favor of Four Seasons and against Consorcio shall be entered under Count X.

82. An order of specific performance of the terms and conditions of the Agreement shall also be entered. *See* License Agreement § 11.06(b) (stipulating to order of specific performance).

## INDEX

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

| | PAGE |
|---|---|
| FINDINGS OF FACT | 1271 |
| Background Facts | 1271 |
| Consorcio | 1272 |
| Four Seasons | 1272 |
| The Relationship between the Parties | 1273 |
| The Opening | 1274 |
| The Fidelio Database | 1276 |
| Scala | 1279 |
| The Data Stolen on February 22, 2002 | 1279 |
| The Stolen Data Is Confidential and Proprietary | 1281 |
| The Caracas Local Network | 1282 |
| The Key Computer Systems of the Hotel | 1283 |
| The Caracas Intranet | 1284 |
| Pre–Opening Network Difficulties | 1284 |
| The Connected Physical Network | 1285 |
| Pre–Opening Efforts to Separate the Networks | 1286 |
| Four Seasons' Network Security Protocols | 1287 |
| The Hotel's Network Configuration after Opening | 1288 |
| Events Which Led Four Seasons To Believe Its Network Was Being Violated | 1289 |
| Consorcio Had The Motive, Means and Opportunity | 1292 |
| Bencomo's Training | 1293 |
| Forensic Examination Reveals Access | 1294 |
| Consorcio's Spoliation of Evidence | 1298 |
| Consorcio's Fabrication of Evidence | 1300 |
| Four Seasons' Global Virtual Private Network | 1300 |
| OpenReach | 1301 |
| The OpenReach Logs | 1302 |
| Analysis of the OpenReach Logs | 1304 |
| Four Seasons was Damaged by Consorcio's Unauthorized Access | 1307 |
| Four Seasons' Corporate Customers in Fidelio | 1308 |
| Four Seasons Incurred Expenses | 1309 |
| Background Reputation Facts | 1309 |
| Consorcio's Non–Compliance with the License Agreement | 1311 |

Consorcio's Failure to Follow Four Seasons' Quality
  Standards .......................................... 1311
Consorcio's Interference with Financial Operations .......... 1315

CONCLUSIONS OF LAW ...................................... 1321
  Count I—Computer Fraud and Abuse Act .................. 1321
  Count II—Electronic Communications Privacy Act .......... 1324
  Count III—Uniform Trade Secrets Act..................... 1325
  Counts IV, V and VIII—Lanham Act Unfair Competition,
    Trademark Infringement And Trademark Dilution ......... 1327
  Counts VI and VII—Florida Unfair Competition And Trade-
    mark Infringement .................................... 1332
  Count IX—Florida Trademark Dilution .................... 1333
  Count X—Breach of Contract ............................ 1333